UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STOBERT HOLT,

     Applicant,

v.                                    CASE NO. 8:19-cv-2730-SDM-TGW

SECRETARY, Department of Corrections,

     Respondent.

_____/

## **ORDER**

     Holt applies under 28 U.S.C. § 2254 for a writ of habeas corpus (Docs. 1 and 2) and challenges his convictions for manslaughter and extortion, for which Holt is imprisoned for thirty years.  Numerous exhibits support the response.  (Doc. 10)  The respondent admits the application's timeliness (Doc. 10 at 25–26) but argues that some grounds are unexhausted and procedurally barred.  (Doc. 10 at 26–27)

## **I. BACKGROUND**[1]

     Robert Wiles, who was twenty-six, worked at his father's airplane maintenance company for two years.  Wiles worked at a facility in Lakeland, Florida, and his father worked at the company's headquarters in Toledo, Ohio.

     On the morning of April 3, 2008, Wiles's father called Wiles on the telephone, but Wiles did not answer.  Wiles's father left his mobile telephone in his car while he

---

[1] This summary of the facts derives from the briefs on direct appeal (Docs. 21-10 at 436–502 and 27-1 at 2–28) and the trial transcripts.

attended a meeting until 7:00 P.M.  Wiles's father returned to his car and saw on his telephone that Wiles had called him three times.  Wiles's father called Wiles, someone answered, but no one spoke.  Wiles's father read a text message sent earlier from Wiles: "Mr. Wiles[,] I suggest you read your Lakeland e-mail if you ever want to see your son again. We can't imagine why you wouldn't answer a call from your son."

Wiles's father knew that Wiles planned to attend a trade show in Dallas, Texas.  Wiles's father did not immediately become concerned because he thought that Wiles may have sent the text message as a joke for April Fools' Day.  Wiles's father met Wiles's supervisor at the company's headquarters in Toledo, accessed his work e-mail account, and saw the following message from Wiles's e-mail account:

> We have Robert. If you hope to see him alive again you must follow our instructions without deviation! Do not speak about this to anyone including family — tell everyone Robert is ill. Do not contact ANY authorities or private parties. Obtain an item of luggage of the appropriate size and place in it $750,000.00 in small unmarked untraceable bills.
>
> Place the luggage containing the money in a plain cardboard box and ship it to your Lakeland facility with detailed instructions that it is highly confidential materials for a special project that your son is working on. You should instruct someone you trust to place the box unopened in your son's office.
>
> This must be completed by the evening of the 8th. NO EXCUSES! NO EXCEPTIONS! Remember we are watching everything and if you think you can outsmart us it will cost your son his life.
>
> Group X.

Wiles's father contacted the Federal Bureau of Investigations and arranged for Holt, the manager at the Lakeland facility, to provide law enforcement access to the facility.

Wiles and Holt frequently clashed with each other at work. Wiles blamed Holt for the Lakeland facility's underperformance and poor customer service. Holt blamed Wiles, who was young and lacked experience, for underestimating both the cost of work and the time needed to complete work. Holt and other employees at the Lakeland facility alienated Wiles, even though Wiles, the son of the owner of the company, would likely become an owner of the company in the future. The company's chief operating officer encouraged Wiles and Holt to work together and moved Wiles's office next to Holt's office. Wiles's unrealistic promises to clients affected both the overall output at the facility and Holt's quarterly bonus. Holt asked the chief operating officer to transfer Wiles to another facility. One week before Wiles disappeared, an employee told Wiles that Holt and two other employees did not like Wiles. Wiles responded that he was not concerned because the company might soon terminate Holt.

On April 1, 2008, Holt called a technician and asked if he planned to return to the facility that evening. The technician confirmed that he did. Holt normally left work at 4:30 P.M. but greeted the technician at 5:30 P.M. The technician felt that Holt wanted him to leave because Holt followed him around the facility. The technician's timecard showed that he left the facility at 6:10 P.M.

Phone records showed that Holt called a Home Depot in Lakeland near the Imperial Swan Hotel on the evening of April 1, 2008. Thirteen minutes later, two rolls of duct tape and a plastic tarp were purchased from that Home Depot. Video surveillance at the Imperial Swan Hotel showed that Holt entered the hotel around 9:00 P.M. and exited the hotel about ten minutes later. Holt returned to the hotel just before midnight.

The company's records showed that someone used Wiles's code to disarm the alarm system at 7:15 P.M. and re-arm the alarm system at 7:18 P.M. During this time, cell site data showed Holt's mobile telephone near the Lakeland facility.

Wiles's father received on April 3, 2008 the text message from Wiles's telephone suggesting that he read his work e-mail. Cell site data showed that Wiles's mobile telephone traveled east from Lakeland to Orlando the evening of April 3, 2008. Photographs from cameras installed at toll booths, records from the toll booth operator, bank records, and cell site data confirmed that Holt, his car, and his mobile telephone traveled east along the same route about the same time.

FBI agents interviewed Holt. Holt admitted to the agents that he lied to his wife about traveling to Dallas to attend the conference. Holt instead stayed in Lakeland at the Imperial Swan Hotel to meet a female friend, Beverly Vowels. Vowels could not meet Holt, and Holt remained in Lakeland. Holt claimed that he last saw Wiles on April 1, 2008 at 6:30 P.M. Holt claimed that he went to Hooters at 6:45 P.M. to drink beer. Surveillance video from Hooters showed that Holt never entered or exited the restaurant that night. Holt claimed that he went to the Outback

at 9:00 P.M. and paid his bill with a credit card.  Records from the Outback

restaurant showed that Holt never paid a bill with a credit card on that day.

Holt admitted to the agents that he drove to Orlando on April 3, 2008 to visit

another female friend named Bridgett Beard.  Holt could not explain why cell site

data showed that his mobile telephone and Wiles's mobile telephone traveled

together to Orlando that evening.

Holt denied keeping a firearm in his car and consented to a search of his car.

Agents found a forty-caliber Sig Sauer handgun in a gun case wrapped in a plastic

bag underneath the hood of Holt's car.  Holt could not explain the presence of the

gun, and agents did not seize the gun.  Five days after the agents' discovery of the

handgun, Holt told the agents that he had placed the handgun in his car for

protection in January 2008 and used the handgun for target shooting.  Holt claimed

that he had kept the handgun in the trunk but moved the handgun underneath the

hood in April 2008.  Holt said he did not disclose this explanation about the

handgun to the agents earlier because Holt feared how the agents would respond.

On April 21, 2008, Holt paid a deposit to a gun shop for a new forty-caliber

barrel for the forty-caliber handgun that the agents discovered underneath the hood

of his car.  The gun shop owner testified that a gun owner typically will not purchase

a replacement barrel of the same caliber because a barrel will not wear out from

normal use during the lifetime of the gun owner.  A firearms expert testified that a

barrel leaves unique marks on a bullet discharged through the barrel.  A tool-mark

examiner can match the unique marks left on the bullet with the barrel through

which the bullet traveled.  The examiner testified that changing the barrel will change the unique markings left on a bullet.

The defense presented testimony by Carrie Lindsey, whose husband, Steven Lindsey, worked for the airplane maintenance company.  In 2002, Wiles's father fired Steven Lindsey after Lindsey injured a client while driving under the influence of alcohol.  Steven Lindsey continued to work at other companies until his death from cancer in 2009.  On April 1, 2008, when Wiles disappeared, Lindsey traveled for a week on a business trip.  During the trip, Carrie Lindsey received telephone calls from people who were trying to locate Steven Lindsey.  After his return from the trip, Steven Lindsey appeared sick and tired as if he had abused drugs.

James Blake testified that, on April 12, 2008, police stopped him while he was driving a gold-colored Ford pickup truck, which he borrowed from a friend named Armstrong, who identified Steven Lindsey as the owner of the truck.  Two women with Lindsey offered to let Armstrong use the truck for a few hours in exchange for crack cocaine.  Armstrong instead gave one of the women thirty dollars, and Lindsey gave him the keys.  Afterwards, Armstrong picked up Blake and let Blake use the truck.

Wiles's father testified that Steve Lindsey worked for his company as a mechanic.  After Wiles's father fired Lindsey, Wiles's father continued to purchase and sell airplane parts with Lindsey.  Wiles's father agreed to give Lindsey an expensive airplane part that Lindsey needed to complete a repair if Lindsey agreed to pay Wiles's father after receiving payment for the repair.  Lindsey never paid Wiles's

father for the part.  Lindsey wanted to return to work for Wiles's father.  Wiles's father told Lindsey that he needed to pay for the part before Wiles's father would hire him again.  Other employees who worked at the company, including Wiles, encouraged Wiles's father to hire Lindsey.  Lindsey became angry when Wiles's father refused to answer his telephone calls.

An FBI agent testified that he interviewed Lindsey about Wiles's disappearance on April 16, 2008 and learned that Wiles had called Lindsey on April 1, 2008 and April 7, 2008.  Wiles's father received the e-mail demanding a ransom on April 3, 2008.

John Berizzi, a sales manager at the airplane maintenance company, testified that Wiles's father referred to Wiles as the "CP," or the crown prince.  When problems arose in the company, Wiles spoke directly with his father.  Because Wiles lacked experience, Wiles misunderstood the problem and did not correctly report the problem to his father.  Lindsey asked Berizzi to speak with Wiles's father about hiring Lindsey.  Wiles's father became upset and "blasted" Berizzi when Berizzi spoke with him about Lindsey.

Kelly Short, a turbine shop inspector at the company, testified that Wiles instructed another employee on April 1, 2008 to speak with him before buying or selling parts with Lindsey.  Short had discovered that Lindsey tried to sell parts that belonged to an airplane already in the company's shop.  Mark Hornby, a mechanic with the company, testified that he discovered that Lindsey stripped an airplane part from an engine in the shop and tried to sell that part to the company.  Hornby told

Wiles that Lindsey was not the type of person with whom the company should work. On April 1, 2008, Wiles told Hornby that he agreed.

David Corwin, who worked as a propulsion manager at the company, testified that he formed his own company and sent Lindsey money to complete a job in Florida, but Lindsey failed to complete the job. Also, Corwin gave Lindsey money to purchase parts, but Lindsey failed to purchase the parts for Corwin and kept the money. Before Wiles disappeared, Lindsey repeatedly asked Corwin for money. A month after Wiles disappeared, Lindsey told Corwin that he learned that the kidnappers demanded $750,000.00. Corwin called the FBI because the news initially reported that the kidnappers demanded $10,000.00.

During an interview on April 8, 2008, an FBI agent asked Lindsey whether he resented Wiles's father, and Lindsey responded, "[H]ell, yes, I want to break a chair over his back and breechload [him] with splinters." Lindsey referred to Wiles's father as "Big Tom" and "Fat Daddy" and described him as self-centered.

Stobert Holt testified in his own defense. Holt owned and used firearms for hunting and target shooting since he was nine. In 1998 he purchased the forty-caliber Sig Sauer handgun that agents discovered in his car. Holt's father taught Holt how to modify firearms. Holt tried to modify the barrel of the forty-caliber handgun because ammunition jammed in the handgun when reloading. He purchased a replacement barrel for the handgun because he damaged the barrel while trying to modify it. He forgot that he had moved the handgun to a mechanic's bucket underneath the hood of his car several weeks before the FBI searched his car.

Holt described Wiles as very outgoing and likeable and admired Wiles's work ethic.  Holt assumed that Wiles would eventually manage the company.  Holt and Wiles initially worked well together but problems with communication arose between them.  Holt and Wiles discussed the problem, and Wiles agreed to try to improve his communication.  In March 2008, Holt and Wiles went to Collier County together to meet with a client, and both enjoyed discussing fishing and looking at boats while on the trip.

Holt purchased a second mobile telephone because he did not want his wife to know that he communicated with other women.  Holt told his wife that he was going to the conference in Dallas so that he could meet with Beverly Vowels, a friend from high school who was visiting Florida.  Holt planned to meet Vowels on April 1, 2008 in Naples, Florida, but Vowels was unable to meet.

On the evening of April 1, 2008, Holt met the technician at the gate of the Lakeland facility because the technician drove a rental car that Holt did not recognize and the gate at the entrance of the facility did not work.  After a short while, Holt encouraged the technician to leave because Holt thought that the technician was needlessly billing for overtime.  Wiles was at the facility working, and Holt informed Wiles that the gate was broken.  Holt never saw Wiles again, did not know what happened to Wiles, and denied killing Wiles.

After work on April 1, 2008, Holt went to either Chili's or Abuelo's to drink margaritas.  While at the bar, Holt called Home Depot because the company had recently obtained a credit card for Home Depot and needed to replace window

blinds.  After finishing his margaritas, Holt drove to the Imperial Swan Hotel to check into a room.  After checking in, Holt went to the Outback to eat dinner and went to Hooters after dinner.  After work on April 2, 2008, Holt went to Hooters to drink beer and to Spice Thai to eat dinner.  Holt asked a waitress at Spice Thai to meet him at his hotel.  The waitress came to the hotel to drink alcohol with Holt at the bar but left early because the bar was closed.  After work on April 3, 2008, Holt drove to Orlando to stay with Bridgett Beard, a female friend whom Holt had known for a long time.  Early the following morning, Wiles's father and an FBI agent called Holt.  Holt felt shocked when Wiles's father called him at 4:00 A.M. to tell him that Wiles "had got himself into some trouble."  Holt met two FBI agents at the Lakeland facility that morning.

On April 10, 2008, Holt met with the FBI agents again, agreed to a search of his computers and his car, and admitted that he had traveled to Orlando on April 3, 2008.  Holt could not explain why he traveled in the same direction as Wiles's mobile telephone.  Until the very early morning on April 11, 2008, the FBI agents continued to question Holt and ask him to describe where he went on March 31, April 1, April 2, and April 3.  Holt was extremely tired, could not remember exactly where he went, and tried to use receipts in his wallet to remember where he went on those days.

## II.  EXHAUSTION AND PROCEDURAL DEFAULT

The respondent argues that Ground One, Ground Two, Ground Ten, and Ground Eleven are procedurally barred from federal review because Holt failed to

exhaust the claims.  (Doc. 10 at 26–27)  The respondent further argues that sub-claims in the remaining grounds are procedurally barred from federal review because Holt failed to exhaust the sub-claims.  (Doc. 10 at 26–27)  "[E]xhaustion of state remedies requires that petitioners 'fairly presen[t]' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights."  *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)).  "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim."  *Baldwin v. Reese,* 541 U.S. 27, 29 (2004) (citing *Henry*, 513 U.S. at 365–66).

**Ground One:**

Holt asserts that the trial court violated his federal right to due process and federal right to a fair trial by admitting evidence that agents discovered a firearm in his car nine days after the crime, evidence that Holt owned fifteen other firearms, and evidence that an unknown individual purchased duct tape and plastic sheets at Home Depot around the time of the crime. (Doc. 1 at 4–6)  Holt presented a similar claim as his first issue on direct appeal but presented that issue under state law and not as the violation of a federally protected right.  (Doc. 10-6 at 464–79)  The failure to alert the state appellate court of the claim that the trial court violated a federally protected right fails to meet the exhaustion requirement.  *Henry*, 513 U.S. at 366 ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial

denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").  Ground One is unexhausted.

**Ground Two:**

Holt asserts that the trial court violated his federal right to due process and federal right to a fair trial because the prosecutor failed to prove the crime beyond a reasonable doubt.  (Doc. 1 at 7–8)  Holt presented a similar claim as his second issue on direct appeal but presented that issue under state law and not as the violation of a federally protected right.  (Doc. 10-6 at 480–89)  On direct appeal, Holt asserted that the prosecutor failed to rebut the defense's hypothesis of innocence.  (Doc. 10-6 at 480–89)  "Under federal law, the prosecution does not have 'an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt.'"  *Preston v. Sec'y, Fla. Dep't Corrs.*, 785 F.3d 449, 461 (11th Cir. 2015) (quoting *Jackson v. Virginia*, 443 U.S. 307, 326 (1979)).  The failure to alert the state appellate court of the claim that the trial court violated a federally protected right fails to meet the exhaustion requirement.  *Preston*, 785 F.3d at 461.  Ground Two is unexhausted.

**Ground Three:**

Holt asserts that appellate counsel was ineffective for not arguing on direct appeal that the trial court violated his federal right to due process and his federal right to notice of the charges against him by overruling trial counsel's objection to an instruction on accomplice liability.  (Doc. 1 at 9–10)  He further asserts that appellate counsel's ineffective assistance violated his federal right to due process.  (Doc. 1 at 9)

The respondent asserts that Holt failed to raise in his state petition a federal due process clause claim.  (Doc. 10 at 37)  However, in his state petition, Holt raised an ineffective assistance of appellate counsel claim and cited *Strickland v. Washington*, 466 U.S. 668 (1984).  (Doc. 10-6 at 613)  *Strickland*, 466 U.S. at 684–85, explains: "The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment, including the Counsel Clause . . . ."  *Smith v. Robbins*, 528 U.S. 259, 276–77, 285–86 (2000), holds that *Strickland* applies to an ineffective assistance of appellate counsel claim and that federal due process guarantees a defendant review on direct appeal.  Because Holt's ineffective assistance of appellate counsel claim implicates his federal right to due process, the federal due process claim is exhausted.

### Ground Four:

Holt asserts that trial counsel was ineffective for not investigating and presenting testimony by Ann Vowels, Joy Phothirath, Amanda Beard, and Sherri Anderson.  (Doc. 1 at 11–13)  The respondent asserts that Holt failed to raise a claim concerning Sherri Anderson.  (Doc. 10 at 39)  In his motion for post-conviction relief and brief on appeal, Holt failed to assert that trial counsel was ineffective for not investigating and presenting testimony by Sherri Anderson.  (Docs. 10-7 at 127–34 and 10-9 at 111–14)  Holt is barred from raising the claim concerning Sherri Anderson in a successive Rule 3.850 motion.  Fla. R. Crim. P. 3.850(b), (h).  Because Holt cannot raise the claim concerning Sherri Anderson in state court, the claim is

procedurally barred in federal court.  *Snowden v. Singletary*, 135 F.3d 732, 736

(11th Cir. 1998) ("[W]hen it is obvious that the unexhausted claims would be

procedurally barred in state court due to a state-law procedural default, we can

forego the needless 'judicial ping-pong' and just treat those claims now barred by

state law as no basis for federal habeas relief.").

**Ground Five, Ground Six, Ground Seven, Ground Eight, Ground Nine, Ground**

**Twelve, and Ground Thirteen:**

Holt raises ineffective assistance of trial counsel claims and asserts that trial

counsel's ineffective assistance violated his federal right to due process.  (Doc. 1 at

14–27, 34–39)  The respondent asserts that Holt failed to raise in his post-conviction

motion a federal due process claim.  (Doc. 10 at 47–48, 51–52, 54, 56, 58, 65, 68)

Holt raised the ineffective assistance of counsel claims in his post-conviction motion

and brief on appeal (Docs. 10-7 at 30–35, 41–48, 53–56, 136–45, 146–48 and 10-9 at

117–27, 131–34, 136–42, 147–54) and cited *Strickland*.  (Docs. 10-7 at 13, 124–25)

*Strickland*, 466 U.S. at 684–85, explains that ineffective assistance of counsel violates

the right to a fair trial guaranteed by federal due process.  Because the ineffective

assistance of counsel claims implicate Holt's federal right to due process, the federal

due process claims are exhausted.

**Ground Ten:**

Holt asserts that trial counsel was ineffective for not objecting to the jury

instruction for manslaughter by act ("sub-claim A") and for not objecting to the lack

of an instruction on manslaughter by culpable negligence ("sub-claim B").  (Doc. 1 at

28–30)  In his motion for post-conviction relief and his brief on post-conviction appeal, Holt asserted that trial counsel was ineffective for not objecting to the instruction for manslaughter by act.  (Docs. 10-7 at 48–50 and 10-9 at 142–44)  Because Holt raised sub-claim A but did not raise sub-claim B, sub-claim B is unexhausted.  *Kelley v. Sec'y, Dep't Corrs.*, 377 F.3d 1317, 1345 (11th Cir. 2004).  Holt is barred from raising sub-claim B in a successive Rule 3.850 motion.  Fla. R. Crim. P. 3.850(b), (h).  Because Holt cannot raise sub-claim B in state court, sub-claim B of Ground Ten is procedurally barred in federal court.  *Snowden*, 135 F.3d at 736.

**Ground Eleven:**

Holt asserts that the prosecutor violated his federal right to due process by failing to respond to the defense's motion for a bill of particulars.  (Doc. 1 at 31–33) ("Due Process Claim")  Generously construed, Holt's *pro se* federal petition further asserts that trial counsel was ineffective for not objecting to the prosecutor's failure to respond to the motion for a bill of particulars.  (Doc. 1 at 31–32)  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  ("Ineffective Assistance of Counsel Claim")

### Due Process Claim

Holt asserts that the prosecutor violated his federal right to due process by failing to respond to the defense's motion for a bill of particulars.  (Doc. 1 at 31–33) In his motion for post-conviction relief, Holt raised a similar claim but asserted that the prosecutor violated Rules 3.140 and 3.220, Florida Rules of Criminal Procedure, his "right to due process," and his "due process right to be informed of the nature and cause of the accusation."  (Doc. 10-7 at 148–49)  In his brief on appeal, Holt

asserted that the prosecutor violated his "right to be informed of the nature of the charges against him" and his right to "due process" and asserted that the trial court violated Rule 3.140.  (Doc. 10-9 at 145–47)  Holt failed to cite either the Sixth Amendment or a federal opinion addressing the Sixth Amendment right to be informed of the nature and cause of the accusation.  The state constitution grants a defendant the right to be informed of the nature and cause of the accusation.  Art. I, § 16(a), Fla. Const.  Rule 3.140(n) requires the prosecutor to disclose a statement of particulars if the indictment "fails to inform the defendant of the particulars of the offense sufficiently to enable the defendant to prepare a defense."

    The failure to alert the state court of the claim that the trial court violated a federally protected right fails to meet the exhaustion requirement.  *Henry*, 513 U.S. at 366.  "[T]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record."  *McNair v. Campbell*, 416 F.3d 1291, 1303 (11th Cir. 2005) (citation and internal quotations omitted).  "[I]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court."  *Gray v. Netherland*, 518 U.S. 152, 163 (1996) (citation omitted).  "[I]t [is] far more straightforward to simply require that when petitioners intend to bring a federal claim, they say so, in words or substance."  *Preston*, 785 F.3d at 462.  Holt is barred from raising a prosecutorial misconduct claim in a successive Rule 3.850 motion.  Fla. R. Crim. P. 3.850(b), (h).  Because Holt cannot raise the claim in state court, the

claim is procedurally barred in federal court.  *Snowden*, 135 F.3d at 736.[2]

## Ineffective Assistance of Counsel Claim

Holt asserts that trial counsel was ineffective for not objecting to the prosecutor's failure to respond to the motion for a bill of particulars.  (Doc. 1 at 31–32)  Because Holt raised this claim and cited *Strickland* in his motion for post-conviction relief and his brief on post-conviction appeal (Docs. 10-7 at 13, 55–56 and 10-9 at 150–54), the ineffective assistance of counsel claim is exhausted.

Ground One, Ground Two, the claim concerning Sherri Anderson in Ground Four, sub-claim B of Ground Ten, and the due process claim in Ground Eleven are barred from federal review absent a showing of either "actual cause and prejudice" or a "fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 496 (1986).  Holt proffers no specific facts to establish either.  (Doc. 13 at 4–5)  Consequently, Ground One, Ground Two, the claim concerning Sherri Anderson in Ground Four, sub-claim B of Ground Ten, and the due process claim in Ground Eleven are procedurally barred from federal review.

## III.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 governs this proceeding.  *Wilcox v. Fla. Dep't Corrs.*, 158 F.3d 1209, 1210 (11th Cir. 1998).  Section 2254(d), which creates a highly deferential standard for federal court review of a state court adjudication, states:

---

[2] The respondent also asserts that the claim is procedurally barred in federal court because the post-conviction court denied the claim on an independent and adequate state procedural ground. (Doc. 10 at 63) The post-conviction court denied the claim on the merits. (Doc. 10-7 at 243)

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
>> resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000), explains this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. . . . Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 693 (2002). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing

law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).  The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Cone*, 535 U.S. at 694. "AEDPA prevents defendants — and federal courts — from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010).  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("This is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted).

When the last state court to decide a federal claim issues an explanatory and reasoned opinion, a federal habeas court reviews the specific reasons in the opinion and defers to those reasons if they are reasonable.  *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  When the relevant state-court decision is not accompanied with reasons for the decision, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 138 S. Ct. at 1192.  A respondent may contest "the presumption by showing that the

unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ."  *Wilson*, 138 S. Ct. at 1192.

In a *per curiam* decision without a written opinion the state appellate court affirmed the denial of Holt's Rule 3.850 motion for post-conviction relief.  (Doc. 10-9 at 161)  A state appellate court's *per curiam* decision without a written opinion warrants deference under Section 2254(d)(1).  *Wright v. Sec'y, Dep't Corrs.*, 278 F.3d 1245, 1254 (11th Cir. 2002).  *Richter*, 562 U.S. at 100 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

As *Pinholster* explains, 563 U.S. at 181–82, review of the state court decision is limited to the state court record:

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time, *i.e.*, the record before the state court.

"[A] determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  Holt bears the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  The presumption applies to a finding of fact but not to a mixed determination of law and fact.  *Parker v. Head*, 244 F.3d 831, 836 (11th Cir. 2001).  Holt's federal application

presents the same grounds that he presented to the state court.  The state court's

rejection of Holt's claims warrants deference in this federal action.  (Docs. 10-7

at 115–20, 239–44 and 10-9 at 54–66)

## IV.  INEFFECTIVE ASSISTANCE OF COUNSEL

Holt claims ineffective assistance of counsel, a difficult claim to sustain.

"[T]he cases in which habeas petitioners can properly prevail on the ground of

ineffective assistance of counsel are few and far between."  *Waters v. Thomas*,

46 F.3d 1506, 1511 (11th Cir. 1995) (quoting *Rogers v. Zant*, 13 F.3d 384, 386

(11th Cir. 1994)).  *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998), explains

that *Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective assistance of

counsel claim:

> The law regarding ineffective assistance of counsel claims is
> well settled and well documented. In *Strickland v. Washington*,
> 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the
> Supreme Court set forth a two-part test for analyzing ineffective
> assistance of counsel claims. According to *Strickland*,
>
> > First, the defendant must show that counsel's
> > performance was deficient. This requires showing
> > that counsel made errors so serious that counsel
> > was not functioning as the "counsel" guaranteed
> > the defendant by the Sixth Amendment. Second,
> > the defendant must show that the deficient
> > performance prejudiced the defense. This
> > requires showing that counsel's errors were so
> > serious as to deprive the defendant of a fair trial,
> > a trial whose result is reliable.

"There is no reason for a court deciding an ineffective assistance claim . . .

to address both components of the inquiry if the defendant makes an insufficient

showing on one." *Strickland*, 466 U.S. at 697.  "[C]ounsel is strongly presumed to

have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690. *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." 466 U.S. at 690.

Holt must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To meet this burden, Holt must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

Holt cannot meet his burden by showing that the avenue chosen by counsel proved unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). *Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91.

Sustaining a claim of ineffective assistance of counsel under Section 2254(d) is very difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105.  *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) ("Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'") (quoting *Johnson v. Sec'y, Dep't Corrs.*, 643 F.3d 907, 911 (11th Cir. 2011)).

In denying Holt's Rule 3.850 motion for post-conviction relief, the state court recognized that *Strickland* governs a claim of ineffective assistance of counsel.  (Docs. 10-7 at 115, 239 and 10-9 at 55)  Because the state court rejected the grounds based on *Strickland*, Holt cannot meet the "contrary to" test in Section 2254(d)(1).  Holt instead must show that the state court either unreasonably applied *Strickland* or unreasonably determined a fact.  In determining "reasonableness," Section 2254(d) authorizes determining only "whether the state habeas court was objectively reasonable in its *Strickland* inquiry" and not independently assessing whether counsel's actions were reasonable.  *Putman v. Head*, 268 F.3d 1223, 1244 n.17 (11th Cir. 2001).  The presumption of correctness and the highly deferential standard of review require that the analysis of each ground begin with the state court's analysis.

## A.  Grounds of IAC Before and During Trial

### Ground Four:

Holt asserts that trial counsel was ineffective for not investigating and presenting testimony by Ann Vowels, Joy Phothirath, and Amanda Beard.  (Doc. 1 at 11–13)  The post-conviction court summarized the claim as follows (Doc. 10-9 at 55–58) (state court record citations omitted):

> [Defendant asserts:] "[Trial] Counsel is required to make an adequate investigation of all witnesses prior to proceeding to trial. In the instant case, counsel failed to investigate and call three exculpatory witnesses who would have testified that Mr. Holt was with them individually throughout the times that Mr. Holt allegedly committed this crime. Counsel's failure to call these witnesses rendered substantial ineffective assistance of counsel requiring relief. Should this Honorable Court grant the requested relief?"

> The Defendant names three potential witnesses which he calls exculpatory witnesses. His allegations involving these potential witnesses, Ann Vowels, Joy Phothirath, and Bridget Beard are discussed below. The Defendant asserts, "Counsel's failure to call these three exculpatory witnesses allowed the State to claim the testimony by Defendant regarding his activities with these witnesses was just a distraction. Because of this, Defendant feels his testimony regarding his motives and whereabouts was rendered ineffectual and his credibility was undermined. Had counsel been effective and called the named exculpatory witnesses[,] [t]he outcome of trial would have been different. The named exculpatory witnesses were in a position to corroborate the Defendant's testimony regarding the nights in question. By counsel's failure in calling these witnesses, it eliminated his theory of defense[.] [T]herefore, it was critical for counsel to investigate and call these witnesses. Failure to present the above testimony prejudiced Defendant in that there is a reasonable probability that, had this testimony been presented to the jury, the outcome of the proceeding would have been different."

**Ann Vowels**

The post-conviction court denied the claim that trial counsel was ineffective for not investigating and presenting testimony by Ann Vowels as follows (Doc. 10-9 at 56) (state court record citations omitted):

> With regard to Ann Vowels, the Defendant alleges that he planned to meet her during the week of March 31 [to] April 4, 2008, while she and her daughters were spending spring break in Florida. He claims that, "had counsel been effective and called exculpatory witness Ms. Vowels [ ], her testimony would have been that she and Defendant had planned to meet for several weeks in advance of her spring break trip. Ms. Vowel's testimony would have refuted the State's theory that Defendant feigned the trip to Dallas to facilitate the kidnapping and murder of Robert Wiles." He alleges that she was available to testify at the time of the trial.
>
> The State notes in its response, that it was not disputed that Ann Vowels and the Defendant communicated about getting together. In her opening statement, counsel for the Defendant mentions that the Defendant told his wife he was going on a business trip even though it was his intention to stay in the local area. She argued that it was his hope that he would be able meet up with Ann Vowels who was coming to the Disney area on vacation. She alleges that, despite his efforts to hook up with Ann Vowels on April 1, she has plans and is not available. In his closing argument, the prosecutor notes that the Defendant had planned to spend time with women other than his wife during the period of April 1 [to] 4. The prosecutor explains to the jury that, despite the Defendant's claim that he wanted to get together with Ann Vowels on April 1, the Defendant's contact with Ann Vowels on April 1 indicated he did not actually make an effort to get together with her on that date. There is no dispute between the parties that the Defendant pursued Ms. Vowels to some extent. If she had been called to testify, she would probably have confirmed this and confirmed that they were not able to get together on April 1. This testimony would not have been exculpatory and would not have explained what the Defendant was actually doing on April 1. Counsel's failure to call her as a witness does not fall below an objective standard of reasonableness.

The indictment charged Holt with killing Wiles on April 1, 2008. (Doc. 10-2 at 2)  During opening statements, trial counsel told the jury that Holt lied to his wife about traveling to Dallas so that he could secretly meet Vowels (Doc. 10-3 at 227–29, 231):

<table>
<tr><td>[Trial counsel:]</td><td>Now, Toby Holt besides work has a little bit of a different agenda [on April 1]. He had made contact not long before with someone he had known from Kentucky, a woman named Beverly Ann Vowels. And he began talking — got back in contact and he had been talking and texting with her.</td></tr>
<tr><td></td><td>And he knew that she was coming to Florida for vacation to the Disney area. And he had been steadily working on her sending her messages and texts and talking trying to get her to consider hooking up with him.</td></tr>
<tr><td></td><td>How would he be able to pull that off, you know? Beverly's here and he's — how could he meet up with this woman and be free to do that? Well, he had a plan. He had — he knew that there was this conference going on and so he told Beverly that he was going on this — to this conference and would be out of town for several days. There's nothing weird about that because he went to these kinds of things all the time.</td></tr>
<tr><td></td><td>So he packed a bag as if he were traveling and on the morning on April 1, he left his house and told Beverly he'd be home in a couple of days and he talked to her on the phone. His hope was that he could hook up with Ann Vowels. And he got their receptionist, Dana Machada, to make him a reservation at a hotel they used regularly for [ ] customers at National Flight, which was the Imperial Swan; whereas, it was</td></tr>
</table>

Robert [Wiles] who was actually going on the business trip.

. . .

He's finishing up his day's work. And, but unfortunately he's not able for whatever — he's not able to hook up with Ann Vowels. She's got plans. She's not available.

So now he's at a loss. Beverly — he's told Beverly he's left town and, therefore, he can't go home and Ann Vowels is not available and the only thing to do is to blow some time.

An FBI agent testified that Holt stated that he lied to his wife about traveling to Dallas so that he could secretly meet Vowels (Doc. 10-3 at 964–65):

| [Prosecutor:] | Did you ask Mr. Holt why he had rented a room [at the Imperial Swan Hotel] when he lived in Apollo Beach for the night of April 1? |
|---|---|
| [Agent Kelly:] | Yes, we did. |
| [Prosecutor:] | And what did he say about the reason that he was renting a room? |
| [Agent Kelly:] | He informed us that previously he had received an e-mail at work regarding the Mitsubishi MU2 air show in Dallas, Texas, the same show that Robert Wiles was to be attending on Wednesday morning, April 2. He advised that when he received that e-mail he knew that this would offer him a perfect explanation for his wife Beverly to say that he was going to go to the MU2 air show in Dallas, Texas.

So on the morning of Tuesday, April 1, he proceeded to pack a bag of luggage, left his residence in Apollo Beach, and told his wife that he would be going to the |

Mitsubishi MU2 air show in Dallas, Texas. He indicated that the principle purpose for doing so was to hookup and expand his relationship with Beverly Vowels during that week.

[Prosecutor:]    Now, did he explain how he knew — or where Beverly Vowels was from?

[Agent Kelly:]    He did.

[Prosecutor:]    Where is she from?

[Agent Kelly:]    She's from Kentucky.

[Prosecutor:]    Did he explain whether he was able to see Ms. Vowels during the week of April 1?

[Agent Kelly:]    He had some phone contact with Beverly Vowels, but he was not able to physically see her during that week.

During closing, the prosecutor argued that, even though Holt initially showed interest in meeting Vowels, text messages between Vowels and Holt proved that Holt never asked Vowels to meet him on April 1, 2008 (Doc. 10-6 at 64–65):

[Prosecutor:]    The events of April 1 have to be given a context for it to really be meaningful to you, to really understand just how determined the defendant was.

These are the last text messages the defendant had on April 1, 2008. And I spent some time earlier in the trial going over it. But I just want to remind you how it, how it interrelates with everything else that you have.

Keep in mind that the defendant had carved out this time, April 1, April 2, and April 3, and really April 4 because that was the last day of the conference or the air show in Dallas.

But to spend time with other women that were in his life as gently as I can put it. Now, he's spending $100 a night of money which he doesn't have which he's just throwing on his credit cards and he's actually jockeying his credit cards because they — the bill can't be put on the same card. [He's] got to find one that has room to take the charge on it.

He's spending that kind of money and he has nothing lined up for the night of the [April 1].

He claimed that he was interested in talking to or at least connecting with Beverly Ann Vowels. This is Beverly Ann Vowels's number here. You can look there, the contact — all the contact numbers that were taken from his iPhone. Remember that testimony.

I actually showed it to him and confirmed that it was Beverly Ann Vowels's number. You can check it if you want to know any of these numbers.

But he says he starts the conversation by saying, "hey," sent. She responds by saying that she's on the beach. He says, "nice." What does he say at 3:05 in the afternoon? How does he respond to a woman that he has been pursuing, that the whole reason April 1 was around? This is opportunity here.

And what does he say? "Gonna sneak out with me tomorrow night?" He's not pushing an agenda for that night of April 1. He's already got commitments for that night. And those commitments deal with the disposal of Robert Wiles.

Because Vowels would testify that she never met Holt on April 1, 2008, her

testimony would not rebut the prosecutor's theory that Holt had the opportunity to

kill Wiles on April 1, 2008.  Because the post-conviction court did not unreasonably

determine that Vowel's testimony did not exculpate Holt, the

post-conviction court did not unreasonably deny the claim.  *Reed v. Sec'y, Fla. Dep't*

*Corrs.*, 767 F.3d 1252, 1263 (11th Cir. 2014) ("The state appellate court had still

another wholly independent and reasonable basis for denying relief: Coleman's

account, even if credited, would not have directly exculpated Reed.").

**Joy Phothirath**

     The post-conviction court denied the claim that trial counsel was ineffective

for not investigating and presenting testimony by Joy Phothirath as follows (Doc.

10-9 at 56–57) (state court record citations omitted):

> With regard to Joy Phothirath, the Defendant alleges [that,]
> "Defendant testified that after work on April 2, 2008 he went to
> Hooters for a couple of beers. While there, Defendant testified
> that, he was at Hooters while the alarm code was being used to
> open [the Lakeland facility]. Because some of the cell tower
> sectors utilized by Defendant also covered [ ] the area of [the
> Lakeland facility,] the State alleged Defendant could have left
> Hooters, entered [the Lakeland facility] using Wiles's code, and
> returned to Hooters." The Defendant further alleges, "Had
> counsel been effective and called Ms. Phothirath [to] testify, she
> would have told the jury that Defendant was at the Spice Thai
> restaurant, she waited on him, and they met up later that night.
> This would have corroborated Defendant's testimony about his
> whereabouts on the evening of April 2, 2008. Had the jury
> heard this testimony, there is a likel[ihood] that Defendant
> would have been acquitted. Further, Ms. Phothirath's
> testimony would have been that, while with Defendant, she
> saw no signs that Defendant had been in any physical
> alter[cation], nor did she see any sign of Robert Wiles or his cell
> phone with Defendant or in Defendant's hotel room."
>
> In the [State's response,] the State notes that there is not a
> dispute that the Defendant was at the Spice Thai restaurant and
> met up with Ms. Phothirath later in the evening. During the
> testimony of FBI Special Agent Daniel Kelly[,] the State
> introduced a credit card receipt for that restaurant showing a

7:03 P.M. purchase by Defendant on April 2, 2008. Also, [Agent] Kelly admitted during cross-examination that Ms. Phothirath was in the Defendant's room at the Imperial Swan that evening. The significant question is whether or not the Defendant was at Hooters when an entry was made into [the Lakeland facility] using the victim's code. The Defendant does not allege that Ms. Phothirath could shed any information on that issue because he met up with her later. The State argued that Mr. Holt left Hooters and later returned. The State points out that the Defendant does not provide any information as to why Ms. Phothirath might have been able to recognize Mr. Wiles's cell phone as opposed to Mr. Holt's cell phone. The State claims that they had identical cell phones provided by the company. In his reply, the Defendant argues that he had a Motorola Razor — a "flip-phone" — and Mr. Wiles had a touch-screen smartphone. The Defendant does not explain why Ms. Phothirath would have any reason to know what kind of phone he or Mr. Wiles had. The State points out that it never asserted that Mr. Holt transported the body of Mr. Wiles to the Imperial Swan Hotel. Counsel did not perform deficiently in not calling Ms. Phothirath as a witness because there is no evidence indicating she could have provided any exculpatory information regarding the actions of the Defendant on April 2, 2008.

A representative from an alarm company testified that records show that someone used Wiles's code to disarm the alarm at the Lakeland facility at 7:15 P.M. on April 2, 2008 and re-arm the alarm three minutes later.  (Docs. 10-3 at 556 and 10-4 at 775–76) In closing, the prosecutor argued that Holt used Wiles's code to enter and exit the Lakeland facility on April 2, 2008 (Doc. 10-6 at 10-6 at 32–34):

> [Prosecutor:]     Now, that is critical to your evaluation of this case because at 7:10 Robert Wiles's code is used to enter [the Lakeland Facility].
>
> Now, what is the defendant doing at that time? At 7:14 his phone begins using ADT tower 4511. ADT tower 4511 is the one just to the south.

And an examination of Mr. Holt's records indicate that is a tower that he uses sixty to seventy percent of the time when he's at [the Lakeland facility].

. . .

Now, it does not answer the question of why he would do it. What is the reason that he would go back to [the Lakeland facility] and use [Wiles's] code rather than his own to go in.

But it clearly has something to do with [Wiles], something to do with Mr. Wiles's disappearance and death, and something to do with that ransom demand that had been sent an hour before.

Now, whether he had forgotten the phone or whether there [were] notes that were left related to the ransom demand, there was some evidence that remained that had to be retrieved. Recall the reenactment by Ashely and — Detective Ashley and Detective Grice when they went in. What was it, a minute-and-a-half they said it took. Clearly this was three minutes. Could be accomplished easily.

Now, after he leaves, he goes back to 45 — or, pardon me, 4631. The same tower that he had been accessing earlier for that almost forty text messages. And he stays on that tower for in excess of fifty consecutive text messages, never varied from that tower at all, into the evening.

And that would be consistent as well with what we know about this case and the going to the Imperial Swan on the night of [April 2] and meeting with the waitress from Spice Thai and remaining there for the evening. . . .

An FBI agent testified that Holt stated that he arrived at Spice Thai for dinner at 7:00 P.M. on April 2, 2008 and invited Phothirath, who worked at Spice Thai, to come to his hotel room after she finished work at 10:00 P.M.  (Doc. 10-3 at 966–68)  The prosecutor introduced into evidence a receipt that showed that Holt paid for dinner at 7:03 P.M.  (Doc. 10-3 at 977–79)  Because Phothirath would testify that she served Holt dinner, Holt paid for dinner at 7:03 P.M., and she met Holt after she finished work at 10:00 P.M., her testimony would not rebut the prosecutor's theory that Holt used Wiles's code to enter the Lakeland facility at 7:15 P.M.  Because Phothirath's testimony did not exculpate Holt, the post-conviction court did not unreasonably deny the claim.  *Reed*, 767 F.3d at 1263.

In his post-conviction motion, Holt contended that Phothirath would testify that she did not observe either Wiles or Wiles's mobile telephone in Holt's hotel room and did not observe cuts and bruises on Holt.  (Doc. 10-7 at 133)  Holt did not support his claim with an affidavit or testimony by Phothirath to demonstrate that she would testify in the manner that he contended.  Holt attached to his post-conviction motion an FBI report memorializing an agent's interview with Phothirath.  (Doc. 10-7 at 161–64)  Because the FBI report did not substantiate Phothirath's testimony, the claim was speculative, and the post-conviction court did not unreasonably deny the claim.  *McKiver v. Sec'y, Fla. Dep't Corrs.*, 991 F.3d 1357, 1366 (11th Cir. 2021) ("[W]e have held that a petitioner's own assertions about whether and how a witness would have testified are usually not enough to establish

prejudice from the failure to interview or call that witness.") (citing *Sullivan v. DeLoach*, 459 F.3d 1097, 1109 (11th Cir. 2006)).

Lastly, during closing, the prosecutor argued that, on April 1, 2008, Holt killed Wiles, purchased plastic sheeting and duct tape from Home Depot, checked into the Imperial Swan Hotel and left after a few minutes, and used the plastic sheeting and duct tape to dispose of Wiles's body in another location. (Doc. 10-6 at 58–64, 103) The prosecutor further argued that, because Holt purchased a new barrel for the firearm that the FBI agent found hidden in his car, Holt used the firearm to kill Wiles. (Doc. 10-6 at 55–58) If Holt used a firearm to kill Wiles, Holt did not likely suffer cuts and bruises from a physical struggle. If Holt disposed of Wiles's body at a location other than the Imperial Swan Hotel, Holt did not bring the body into the hotel room. If Phothirath testified that she did not observe Wiles's body at the hotel room and that she did not observe cuts and bruises on Holt, her testimony would not rebut the prosecutor's theory of guilt. Because Phothirath's testimony did not exculpate Holt, the post-conviction court did not unreasonably deny the claim. *Reed*, 767 F.3d at 1263.

**Bridget Beard**

The post-conviction court denied as follows the claim that trial counsel was ineffective for not investigating and presenting testimony by Bridget Beard (Doc. 10-9 at 57–58) (state court record citations omitted):

> With regard to Bridget Beard, the Defendant alleges [that,]
> "The State alleged that it was Defendant who had possession of
> Robert Wiles's cell phone as it traveled from the Lakeland,
> Florida area to the area of Orlando International Airport on

April 3, 2008. Defendant identified Ms. Bridget Beard as the woman he was with the evening of April 3, 2008 and gave counsel Ms. Beard's cell phone number." The Defendant further alleges, Ms. Beard's [ ] testimony would have been that she never saw Robert Wiles or his phone with Defendant, or in Defendant's car, the night of April 3, 2008. Further, Ms. Beard would have testified that she did not see any physical signs on Defendant's body to indicate Defendant had been in any altercation."

As it did with regard to Ms. Phothirath, the State alleges in its response that the Defendant does not provide any information as to why Ms. Beard might have been able to recognize Mr. Wiles's cell phone as opposed to Mr. Holt's cell phone because they had identical cell phones provided by the company. In his Reply, the Defendant points out that he had a Motorola Razor — a "flip-phone" — and Mr. Wiles had a touch-screen smartphone. The Defendant does not explain why Ms. Beard would have any reason to know what kind of phone he or Mr. Wiles had. The State argues in the [State's response] that, "[a]s to the absence of injury to Defendant, it was the State's argument to the jury that the murder took place two days before Defendant's tryst with Beard, on April 1, and that Defendant's inability to consummate his intended philandering with Vowels that day was because he was disposing of the evidence of his murder of Robert Wiles. The State never argued that Mr. Wiles's mortal remains were in the Defendant's automobile when Defendant went to Beard's residence; in fact, toll booth photography established that Defendant was alone in his car. [N]o one [was] in the passenger seat[.] And it is mere speculation to assume that the absence of visible injury to Defendant is in any way exculpatory; many forms of murder, such as gunshots, can be had from a distance."

The Court finds the State's response to the Defendant's allegations [ ] to be well taken.

In his post-conviction motion, Holt contended that Beard would testify that she did not observe either Wiles or Wiles's mobile telephone in Holt's car on April 3, 2008 and did not observe cuts or bruises on Holt.  (Doc. 10-7 at 133)  Because Holt did not support his claim with an affidavit or testimony by Beard to demonstrate that she would testify in the manner that he contended, the claim was speculative, and

the post-conviction court did not unreasonably deny the claim.  *McKiver*, 991 F.3d at 1366.  Also, during closing, the prosecutor argued that Holt killed Wiles and disposed of his body on April 1, 2008.  (Doc. 10-6 at 58–64)  The prosecutor further argued that, because Holt purchased a new barrel for the firearm that the FBI agent found hidden in his car, Holt used the firearm to kill Wiles.  (Doc. 10-6 at 55–58)  If Holt used a firearm to kill Wiles, Holt did not likely suffer cuts and bruises from a physical struggle.  If Beard testified that she did not observe Wiles in Holt's car on April 3, 2008 and that she did not observe cuts and bruises on Holt, her testimony would not rebut the prosecutor's theory of guilt.  Because Beard's testimony would not exculpate Holt, the post-conviction court did not unreasonably deny the claim.  *Reed*, 767 F.3d at 1263.

Ground Three is denied.

**Ground Five:**

Holt asserts that trial counsel was ineffective for not adequately investigating and impeaching at trial Agent Daniel Kelly.  (Doc. 1 at 14–16)  He contends that trial counsel should have impeached Agent Kelly with cell site data ("Sub-claim A") and with testimony by two bartenders at two restaurants that Holt allegedly visited on April 1, 2008 ("Sub-claim B").  (Doc. 1 at 14–16)

**Sub-claim A**

Agent Kelly testified that Holt possessed Wiles's telephone on April 3, 2008 because cell site data proved that Holt's telephone and Wiles's telephone traveled in the same direction from Lakeland to Orlando at the same time.  (Doc. 1 at 15)  Holt

contends that trial counsel should have impeached this testimony by Agent Kelly with evidence proving that the two telephones did not travel in the same direction at the same time.   The post-conviction court denied this claim as follows (Doc. 10-9 at 60–61) (state court record citations omitted):

> The Defendant alleges, "Arguably, the most critical evidence in the State's case against Defendant was that of the cellular phone records. Whoever took Wiles from [the Lakeland facility] used Wiles's phone to send the ransom email on April 2, 2008 and to make several phone calls between the Lakeland, Florida area and the area of Orlando International Airport on the evening of April 3, 2008. As such it was critical to prepare a defense against the allegation that it was Defendant who had Wiles's phone during his trip to meet Bridget Beard on April 3, 2008. Defendant asserts counsel was ineffective for failing to properly investigate Defendant's toll records compared to Wiles's phone records to show it was not Defendant who had Wiles's cell phone the night of April 3, 2008. Utilizing Defendant's Sunpass records for April 3, 2008, Wiles's phone calls depicted on the Sprint coverage map prepared by State's witness Marc Knapp, and the testimony of State's witness Laurie Joiner, we can show that Defendant would not have been in the coverage area for tower sector 3023 when the call from Wiles's phone was made on that tower sector at 7:15 P.M. to 7:16 P.M. the night of April 3, 2008." The Defendant goes on to argue that, "[b]ased on expert testimony it would not be possible for Defendant to be a mile to a mile and a half into the coverage area of sector 2023 and place a call on sector 3023."
>
> . . .
>
> In this [claim], "Defendant argues that the impact of the probability that Defendant did not have Wiles's phone[ and] that [Agent] Kelly's testimony may have been inaccurate . . . is such that had any one of these been presented to the jury there is a reasonable probability that the outcome of the trial would have been different."
>
> The Court asked the State to respond to [this claim]. The State filed an extensive response to [the claim]. The Defendant claims, "Utilizing Defendant's Sunpass records for April 3, 2008, Wiles's phone calls depicted on the Sprint coverage map prepared by State's witness Marc Knapp, and the testimony of State's witness Laurie Joiner, we can show that Defendant

would not have been in the coverage area for tower sector 3023 when the call [from] Wiles's phone was made on that tower sector at 7:15 P.M. to 7:16 P.M. the night of April 3, 2008." The Defendant claims based on the speed he was going, "[t]he evidence indicates that Defendant would have travelled 5.7 miles from Boggy Creek or almost one mile into the coverage area of sector 2023, by the time the call from Wiles's phone was initiated on Sector 3023."

In response to this claim, the State alleges that the phone call on Mr. Wiles's phone that the Defendant is talking about only lasted forty-one seconds. The State argues, "[b]ut Defendant cannot say with precision that he traveled at a constant speed over the entire distance between Boggy Creek and Curry Ford, throwing off his calculation at the beginning. His calculations do not allow for variations in local traffic, where he would have moved faster at some points along the path and more slowly along others. Defendant therefore cannot say with any precision where the phone was, within the coverage area of Tower 23, Side 3, when the call began." The State also asserts that "Mr. Knapp indicated that it is possible to be on multiple towers at the same time based on one's location, with the strongest reflected in the call records; this is especially likely near the equal power boundary."

The State also disagrees with the Defendant's claim that the testimony of State witness Konstantinos Dimitrielos, President of Cyber Forensics 360, supports his argument. The State argues, "Defendant would claim that he switched sectors on Tower 23 and that Mr. Dimitrielos's testimony assists him; it does not, because Mr. Dimitrielos testified consistently with Mr. Knapp that radio frequency coverage between tower sectors is not a hard line, as Defendant seems to believe." The State adds, "And Mr. Dimitrielos agreed that Defendant's Sprint phone and the victim's Sprint phone traveled from Lakeland to Orlando at the same time on April 3, 2008." The State further alleges, "Defendant does not refute the State's position, as [Detective] Kendrick and Mr. Dimitrielos related, that his phone and Mr. Wiles's phone traveled through the same coverage zones at the same time prior to this 41 second call; nor does he refute the photographic evidence placing him at toll booths at the times posited."

. . .

The Court agrees with the State that the Defendant had not shown deficient performance by his trial counsel with regard to

his claim that his counsel should have been able to challenge
the State's argument that it was the Defendant who had Wiles's
phone during his trip on April 3, 2008.

Marc Knapp, a radio engineer for Sprint, testified that if a mobile telephone is located near two cell towers, the telephone can connect to both towers.  (Doc. 10-4 at 251–52)  If the telephone connects to two towers, records show only the connection to the tower with strongest signal.  (Doc. 10-4 at 251–52)

Konstantinos Dimitrelos, a cellular forensic analyst who testified on behalf of the defense, conceded on cross-examination that records demonstrated that Holt's telephone and Wiles's telephone traveled in the same direction on April 3, 2008 (Doc. 10-4 at 399–401):

| [Prosecutor:] | Well, now, in this case you evaluated the maps that were prepared by Mr. Knapp for those two separate Sprint phones? |
|---|---|
| [Dimitrelos:] | Yes, sir. |
| [Prosecutor:] | And on the afternoon, late afternoon, early evening of April 3, you talked about from point A to point B. |
| [Dimitrelos:] | Yes, sir. |
| [Prosecutor:] | Did both of those Sprint phones travel from the area of south Lakeland to the [ ] Orlando area? |
| [Dimitrelos:] | They did, in that direction. Maybe not entirely to the very end point, but in that direction, yes sir. |
| [Prosecutor:] | And was the timeframe in which the phones traveled, did those correspond with the same timeframes — |
| [Dimitrelos:] | They did. |

| [Prosecutor:] | — with the different phones? |
|---|---|
| [Dimitrelos:] | They did. |
| [Prosecutor:] | Based upon your review of those call detail records, the specific towers, sectors used, and coverage maps, the travel from point A to point B, did you see any information that would make it impossible for those two Sprint phones to be actually in the same vehicle as they traveled along Polk Parkway, I-4, and 417? |
| [Dimitrelos:] | No. |

Photographs and records from the toll authority confirmed that Holt's car traveled from Lakeland to Orlando on April 3, 2008. (Doc. 10-3 at 579–81, 588–95, 767–69) Even if expert testimony demonstrated a discrepancy between the tower that connected with Holt's telephone and the tower that connected with Wiles's telephone during the short telephone call on Wiles's telephone on April 3, 2008, other cell site data, photographs, and toll records convincingly proved that Holt's telephone and Wiles's telephone traveled together on April 3, 2008. Because additional expert testimony would not meaningfully impeach Agent Kelly, the post-conviction court did not unreasonably apply *Strickland*. *Williams v. Allen*, 458 F.3d 1233, 1250 (11th Cir. 2006).

### Sub-claim B

Holt asserts that trial counsel was ineffective for not impeaching Agent Kelly with testimony by a bartender at Abuelo's and testimony by a bartender at Outback. (Doc. 1 at 15–16) Holt contends that both bartenders would testify that Holt visited both restaurants on April 1, 2008 between 7:00 P.M. and 10:00 P.M. (Doc. 1

at 15–16)  The post-conviction court denied the claim as follows (Doc. 10-9 at 60–62)

(state court record citations omitted):

> In this [claim], the Defendant [ ] alleges counsel was ineffective
> [for] not investigating and determining the identities of two
> bartenders and utilizing their testimony to establish an alibi for
> the Defendant for [the] hours of 7:00 P.M. to 10:00 P.M. on
> April 1, 2008. He alleges "[t]his testimony would have cast
> considerable doubt on the State's theory that Defendant had
> used this time [ ] to kidnap, kill, and dispose of Wiles."
>
> . . .
>
> In this [claim], "Defendant argues that the impact of the
> probability . . . that Defendant had an alibi from 7:00 P.M. to
> 10:00 P.M. the night of April 1, 2008 is such that had any one
> of these been presented to the jury there is a reasonable
> probability that the outcome of the trial would have been
> different."
>
> . . .
>
> . . . As the Court stated in [ruling on an earlier claim], "It is
> mere speculation to assume that the bartenders who waited on
> the Defendant the night of April 1, 2008, could be identified,
> would have remembered him, would have remembered the
> hours they waited on him, would have been able to account for
> enough of the Defendant's time to foreclose him from having
> had enough time to commit his crime, and would have been
> available to testify at the trial." The Defendant has not been
> able to show that his counsel's performance fell below an
> objective standard of reasonableness with regard to his claims
> [ ]. [The claim] is denied.

Because Holt did not support his claim with an affidavit or testimony by any

of the bartenders to demonstrate that the bartender would testify in the manner that

Holt contended, the claim was speculative, and the post-conviction court did not

unreasonably deny the claim. *McKiver*, 991 F.3d at 1366.  Also, video surveillance

from the Imperial Swan Hotel showed that Holt returned to the hotel on April 1,

2008 at 11:58 P.M.  (Docs. 10-4 at 426–27 and 10-6 at 63)  Holt contended that the

bartenders' testimony would establish an alibi between 7:00 P.M. and 10:00 P.M. The bartenders would not establish an alibi between 10:00 P.M. and 11:58 P.M., when Holt returned to the hotel. Because the bartenders' testimony did not meaningfully impeach Agent Kelly, the post-conviction court did not unreasonably apply *Strickland*. *Williams*, 458 F.3d at 1250.

Ground Five is denied.

**Ground Six:**

Holt asserts that trial counsel was ineffective for not moving to dismiss the indictment before trial. (Doc. 1 at 17–19) He contends that the indictment violated double jeopardy by charging both felony murder and kidnapping and by charging both written threats and extortion ("sub-claim A") and that the indictment failed to state when and where the victim died, the manner of death, whether the perpetrator used a firearm or a weapon to kill the victim, and whether the perpetrator acted alone ("sub-claim B"). (Doc. 1 at 17–18)

**Sub-claim A**

Holt asserts that trial counsel was ineffective for not moving to dismiss the indictment. (Doc. 1 at 17–19) He contends that the indictment violated double jeopardy by charging both felony murder (Count One) and kidnapping (Count Two) and by charging both written threats (Count Three) and extortion (Count Four). (Doc. 1 at 17–18) The post-conviction court denied this claim as follows (Doc. 10-9 at 62) (state court record citations omitted):

> [Defendant asserts:] "Defense counsel provided ineffective assistance of counsel by not challenging the indictment." The

> Defendant mistakenly believes there is a problem with
> kidnapping being mentioned in Count One and in Count Two.
> He is not being charged twice for the kidnapping of Robert
> Wiles. The Defendant notes that he was found guilty by the
> jury of both Count Three and Count Four, but the conviction
> for Count Four was dropped on the basis of double jeopardy.
> However, this does not mean that the indictment itself was
> defective in containing both Counts Three and Count Four.

"A multiplicitous indictment, which 'charges a single offense in more than one count,' violates double jeopardy principles 'because it gives the jury numerous opportunities to convict the defendant for the same offense.'" *United States v. Cannon*, 987 F.3d 924, 939 (11th Cir. 2021) (citation omitted). "'Where the same conduct violates two statutory provisions, the first step in the double jeopardy analysis is to determine whether the legislature . . . intended that each violation be a separate offense.'" *Cannon*, 987 F.3d at 939–40. "If congressional intent is unclear, [a court] appl[ies] the Supreme Court's test set forth in *Blockburger v. United States*, 284 U.S. 299 (1932)." *Cannon*, 987 F.3d at 940. "Under *Blockburger*, 'the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.'" *Cannon*, 987 F.3d at 940 (quoting *Blockburger*, 284 U.S. at 304).

### **Felony Murder and Kidnapping**

The indictment charged Holt with first-degree premeditated and felony murder in Count One and kidnapping in Count Two. (Doc. 10-2 at 2–3)  In Count One, the indictment cited Section 787.01, Florida Statutes, the statute for kidnapping, and Section 782.04, the statute for first-degree murder, and alleged that Holt, "while engaged in the commission of kidnapping, did unlawfully kill a human being."

(Doc. 10-2 at 2)  In Count Two, the indictment cited Section 787.01 and alleged the elements of kidnapping.  (Doc. 10-2 at 3)  Because convictions for felony murder and the underlying felony do not violate double jeopardy, a motion to dismiss the indictment would not succeed, and the post-conviction court did not unreasonably deny the claim.  *Meders v. Warden, Ga. Diag. Prison*, 911 F.3d 1335, 1354 (11th Cir. 2019) ("It is not ineffective assistance of counsel to fail to make an objection that is not due to be sustained.").  *State v. Enmund*, 476 So. 2d 165, 167–68 (Fla. 1985) ("We find sufficient intent that the legislature intended multiple punishments when both a murder and a felony occur during a single criminal episode. . . .  Therefore, we hold that a defendant can be convicted of and sentenced for both felony murder and the underlying felony.") (citing *Missouri v. Hunter*, 459 U.S. 359 (1983)).

Also, because the jury acquitted Holt of kidnapping (Doc. 10-6 at 300) and a court remedies a double jeopardy violation by vacating the conviction and sentence for the lesser offense, Holt cannot demonstrate a reasonable probability that the outcome would change if trial counsel successfully moved to dismiss the indictment. Consequently, the post-conviction court did not unreasonably apply *Strickland*. *Strickland*, 466 U.S. at 694.  *Williams v. Singletary*, 78 F.3d 1510, 1517 (11th Cir. 1996) ("Williams is not entitled to a windfall.  Analogous Florida cases have indicated that the appropriate remedy in this circumstance is to set aside the conviction and sentence for the lesser offense, not the greater.  That is the proper remedy.") (citations omitted).

**Extortion and Written Threats**

The indictment charged Holt in Count Three with extortion and in Count Four with communicating a written threat. (Doc. 10-2 at 3–4)  The jury found Holt guilty of both crimes.  (Doc. 10-6 at 301)  At sentencing, the trial court determined that the two convictions violated double jeopardy and vacated the conviction for communicating a written threat, the lesser offense (Doc. 10-6 at 393):

> This matter came before the Court at the time of the sentencing on March 12, 2012, and the Court has reviewed the pleadings, heard argument of counsel, and has otherwise been more fully informed in the premises. Based thereon, the Court finds that in accordance with the Second District Court of Appeal's opinion in *Dudley v. State*, 634 So. 2d 1093 (Fla. 2d DCA 1994), that the Defendant cannot be sentenced under both Florida Statutes § 836.10 and Florida Statutes § 836.05. The Court has taken into consideration the *Blockburger* test set forth in *Blockburger v. United States*, 284 U.S. 299 (1932), as further discussed in *Benjamin v. State,* 77 So. 3d 781 (Fla. 4th DCA 2011), and has concluded that Count Three of the indictment and Count Four of the indictment allege facts arising out of a single criminal episode. Based thereon, it is ordered and adjudged that the Defendant's Motion to Vacate Judgment of Guilt Based on Double Jeopardy should be, and the same are hereby, granted.

Because under Florida law communicating a written threat is a necessary lesser included offense of extortion, the trial court would not grant a motion to dismiss based on double jeopardy before trial and correctly instructed the jury on both offenses at trial.  *Dudley v. State*, 634 So. 2d 1093, 1094 (Fla. 2d DCA 1994) ("[W]e must conclude that the elements of making a written threat under section 836.10 are subsumed within the offense of extortion."); *State v. Wimberly*, 498 So. 2d 929, 932 (Fla. 1986) ("A 'necessarily lesser included offense' is, as the name implies,

a lesser offense that is always included in the major offense.  The trial judge has no discretion in whether to instruct the jury on a necessarily lesser included offense."); *Sansone v. United States*, 380 U.S. 343, 350 (1965) ("A lesser-included offense instruction is only proper where the charged greater offense requires the jury to find a disputed factual element which is not required for conviction of the lesser-included offense.").  Because trial counsel successfully moved to dismiss the conviction and sentence for communicating a written threat and the trial court vacated the conviction and sentence for the lesser offense, the post-conviction court did not unreasonably apply *Strickland*.  *Strickland*, 466 U.S. at 694; *Williams*, 78 F.3d 1510, 1517.

### Sub-claim B

Holt asserts that trial counsel was ineffective for not moving to dismiss the indictment because the indictment failed to state when and where the victim died, the manner of death, whether the perpetrator used a firearm or a weapon to kill the victim, and whether the perpetrator acted alone.  (Doc. 1 at 17–18)  The post-conviction court denied this claim as follows (Doc. 10-9 at 62–64) (state court record citations omitted):

> The Defendant [ ] alleges that "[d]efense counsel should have objected to the indictment where it failed to show the *corpus delecti* place and time of where charges allegedly took place[;] also the fact [that] the indictment does not show a principal theory and the use of a firearm in the indictment[;] and both of these two were used in Defendant's trial . . . ." The Court asked the State to respond to [the claim].
>
> Count One of the indictment reads[:]

IN THE NAME AND BY AUTHORITY OF
THE STATE OF FLORIDA

The Grand Jurors of the State of Florida,
empaneled and sworn to inquire and true
presentment make in and for the County of Polk
and State of Florida, upon their oath do present
that

STOBERT L. HOLT a/d/a STOBERT L.
HOLT, JR. a/k/a TOBY HOLT

on or about April 1, 2008, in the County and
State aforesaid, from a premeditated design to
effect the death of a human being, to-wit, Robert
Wiles, in violation of Section 782.04 and 787.01,
Florida Statutes, contrary to the form of the
statutes, in such cases made and provided against
the peace and dignity of the State of Florida.

In the [State's response,] the State alleges that the Defendant is
essentially arguing that the State failed to charge a precise
venue and the time of day in the indictment. The State notes
that venue does not have to be alleged in an indictment or
information. *See Tucker v. State*, 459 So. 2d 306, 308 (Fla. 1984).
The State asserts the county of jurisdiction has to be alleged,
which it was. The indictment specified that the murder took
place in the County of Polk and the State of Florida. The State
also argues, "[a]s for the time of an offense, in *Baxter v. Stack*,
270 So. 2d 419, 421 (Fla. 4th DCA 1972), the district court held
that the phrase 'on or about' as a certain date sufficiently
informs a defendant of the time of the charge placed against
him, in compliance with Fla. R. Crim. P. 3.140(d)(3), and does
not render an indictment or information vague or misleading."
The Court agrees with the State. Counsel's performance did not
fall below an objective standard of reasonableness in failing to
challenge the indictment on this basis.

With regard to principal theory the State alleges, "Under
Florida law, a person who is charged in an indictment or
information with commission of a crime may be convicted on
proof that she aided or abetted in the commission of such
crime. *State v. Larzelere*, 979 So. 2d 195, 215 (Fla. 2008). Aiding
or abetting constitutes acting as principal to the crime.
*See* § 777.011, Fla. Stat. (2009). Therefore, it is not necessary to
enunciate the principal theory separately in the charging
document." The Court agrees with the State's argument.

Counsel's performance did not fall below an objective standard of reasonableness in failing to challenge the indictment on this basis.

With regard to the use of a firearm, the State notes in their response, "that the subject of the firearm was litigated prior to the trial, and trial counsel's objections to that evidence were overruled. Tenth Circuit Judge Donald G. Jacobsen recognized that the firearm in question 'is owned by the defendant, was in his car on April 1, 2008, when his car was located at the Defendant's and [victim's] place of employment, and arguably could have been used in the abduction [or] kidnapping of the victim as is posited by the State.'"

In the response, the State goes on to argue, "Judge Jacobsen recognized that in *New v. State*, 211 So. 2d 35 (Fla. 2d DCA 1968), the district court held that '[t]he trial court is allowed great latitude in the reception of circumstantial evidence, allowing the jury to make reasonable inferences from it.'" Here, the State also argued that the weapon would have been accessible to the Defendant at the time of the crime, and that Defendant showed consciousness of guilt by purchasing a replacement barrel for the firearm, 'demonstrat[ing] concealment of something after the fact.'" The State further argues in the response that the test of admission of any evidence is whether that evidence is relevant, and Judge Jacobsen ruled prior to the trial that the firearm was relevant and material to the State's theory of the case.

Trial counsel challenged the firearm evidence via a motion *in limine*. Any challenge regarding the firearm not having been charged in the indictment would have been denied by the trial court. Counsel's performance did not fall below an objective standard of reasonableness in failing to challenge the indictment on this basis.

The Court does not find that counsel's performance fell below an objective standard of reasonableness with regard to the allegations [supporting the claim]. [The claim] is denied.

Whether the indictment alleged sufficient facts to charge a crime is an issue of state law, and a state court's determination of state law receives deference in federal court. *Herring v. Sec'y, Dep't Corrs.*, 397 F.3d 1338, 1355 (11th Cir. 2005).

Because the indictment alleged that Holt killed Wiles in Polk County, Florida "on or about April 1, 2008," the indictment sufficiently alleged both the time and place of the crime. *Rimes v. State*, 133 So. 550, 551 (Fla. 1931) ("In order to charge one with the commission of a criminal offense in this state, the indictment must charge the time, place, and acts done or omitted by the accused which constitute the offense. . . . It is necessary for the indictment to state the county within which the offense was committed, and the proof must affirmatively sustain such allegation.") (citation omitted); *Sparks v. State*, 273 So. 2d 74, 76 (Fla. 1973) ("We hold that an indictment or information alleging the commission of an offense 'on or about' a stated date is not fatally vague in the absence of a showing that time is material to the crime charged or that the accused is prejudiced by the use of the phrase.").

Because the indictment alleged that Holt committed first-degree murder and an aider and abettor may be charged, convicted, and punished as a principal, the trial court appropriately presented to the jury an instruction on aiding and abetting liability.  § 777.011, Fla. Stat. ("Whoever commits any criminal offense against the state, whether felony or misdemeanor, or aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree and may be charged, convicted, and punished as such, whether he or she is or is not actually or constructively present at the commission of such offense.").  *State v. Roby*, 246 So. 2d 566, 570 (Fla. 1971) ("[I]t is now well established in Florida that a person who is charged in an indictment or information with commission of a crime may be

convicted upon proof that he aided or abetted in the commission of such crime
. . . .").

Because the allegations in the indictment tracked the language of the statute
for first-degree murder, the indictment sufficiently alleged the crime even without
allegations describing the manner of death, what weapon the defendant used, and
whether the defendant acted alone. § 782.04(1)(a), Fla. Stat. *State v. Lee*, 651 So. 2d
1221, 1222 (Fla. 2d DCA 1995) ("An information is sufficient if it tracks the statute,
and the state need not present proof with which it intends to establish its case.").
*Hamling v. United States*, 418 U.S. 87, 117 (1974) ("It is generally sufficient that an
indictment set forth the offense in the words of the statute itself, as long as 'those
words of themselves fully, directly, and expressly, without any uncertainty or
ambiguity, set forth all the elements necessary to constitute the offence intended to be
punished.'") (citation omitted).

Because a motion to dismiss the indictment would not succeed, trial counsel
was not ineffective, and the post-conviction court did not unreasonably apply
*Strickland*. *Meders*, 911 F.3d at 1354.

Ground Six is denied.

**<u>Ground Seven:</u>**

Holt asserts that trial counsel was ineffective for not moving to sequester the
jury during trial and deliberations and for not investigating juror misconduct. (Doc.
1 at 20–21) The post-conviction court denied this claim as follows (Doc. 10-7 at
242–43) (state court record citations omitted):

[Defendant asserts:] "Trial counsel rendered ineffective assistance by failing to request sequestration of the jury once deliberations had started; and for not requesting the Court to conduct a proper investigation to determine if the juror who was released due to misconduct may have tainted the other jurors." In his argument[,] the Defendant recognizes case law that there was no requirement of sequestration prior to final retirement in his non-capital case. However, "Defendant argues that this was a capital case initially, with extensive publicity. As evidenced by the fact that '48 Hours Mysteries' was filming the proceedings and the multipl[e] media reports counsel entered into the record each morning. As such, Defendant believes counsel was ineffective in this case for failing to request sequestration." The Defendant also argues that, "counsel was ineffective for failing to [request that] the Court conduct a proper investigation once it was determined Juror Vinzant should be released due to his misconduct. It was verified that Juror Vinzant had been speaking with an outside party regarding the trial and he was released. Counsel was ineffective for failing to request that the court interview Mr. Vinzant and the other jurors because of the probability that Mr. Vinzant had been discussing his opinions with the other jurors. It was counsel's duty to ensure Mr. Vinzant had not improperly influenced other jurors. The probability that, if Mr. Vinzant ignored the judge's instruction not to talk to persons outside the courtroom, he had also ignored the judge's instructions not to talk to the other jurors about the case should not be ignored. The potential for prejudice should have been investigated." There is no requirement that jurors be sequestered in a non-capital case. *See* Rule 3.370(c), Fla. R. Crim. P. Defendant's belief that the jury may have been tainted by Mr. Vinzant is pure speculation, and his counsel's performance did not fall below an objective standard of reasonableness with regard to his allegations [supporting the claim]. [The claim] is denied.

The indictment charged Holt with first-degree murder (Doc. 10-2 at 2), but the prosecutor waived the death penalty. (Doc. 10-2 at 330) Whether sequestration of jurors in a non-capital case is required is an issue of state law, and a state court's determination of state law receives deference in federal court. *Herring*, 397 F.3d at 1355. Under state law, a judge exercises discretion to determine whether

sequestration of jurors during deliberations is necessary in a non-capital case. Fla. R. Crim. P. 3.370(c) ("In all [non-capital] cases, the court, in its discretion, either on the motion of counsel or on the court's initiative, may order that the jurors be permitted to separate. If jurors are allowed to separate, the trial judge shall give appropriate cautionary instructions."). *See also United States v. Hill*, 496 F.2d 201, 203 (5th Cir. 1974) ("The propriety of sequestering the jury is a matter within the sound discretion of the trial court; and the exercise of that discretion will result in reversal only upon a showing of actual prejudice to the accused.").

During *voir dire* and trial, the trial judge repeatedly instructed the jurors to not communicate about or research the case. (Docs. 10-2 at 307–09, 592–95, 606–08, 938–39, 10-3 at 124–29, 157, 262, 430, 439–40, 637–39, 649, 912, 926, 10-4 at 44, 232–33, 369, 518, 529, 642, 748–49, 766–67, 873, 986, 10-5 at 31, 323, 351–52, 611–12, 645–46, 749, 930, 944, 996–98, and 10-6 at 18–19)

During deliberations, the jurors asked to leave for the evening and return the next day to continue to deliberate. (Doc. 10-6 at 253–54) Before the jurors left for the evening, the trial judge instructed the jurors to not communicate about or research the case. (Doc. 10-6 at 255–57) When the jurors returned the next morning, the trial judge confirmed that the jurors had neither communicated about nor researched the case. (Doc. 10-6 at 263–64) A court presumes that a jury follows the trial court's instructions. *Jones v. United States*, 527 U.S. 373, 394 (1999).

Before deliberations, Holt advised the trial judge that he agreed with trial

counsel's decision to allow the jurors to deliberate without sequestration (Doc. 10-5

at 152):

| | |
|---|---|
| [Court:] | One of the inquiries I earlier made was concerning timing and if we reach a point of the jury wanting — being in deliberations and wanting to go home or whatever. |
| | It's my understanding that the State has no objection that we do not sequester the jury. |
| [Prosecutor:] | That's correct, Judge. |
| [Court:] | From the defense point of view, what is the defense point of view? |
| [Trial counsel:] | I have discussed it with Mr. Holt and he and I are of the same mind, which is that we don't want to request the sequestration. |
| | We're just perfectly happy — the Court has admonished them and they seem to have been very serious about their responsibilities, and I think we have to trust them. |
| [Court:] | And, Mr. Holt, is that agreeable with you, sir? |
| [Holt:] | It is, Your Honor. |
| [Court:] | Thank you. |

The trial judge asked Holt a second time and a third time whether he agreed that

sequestration was unnecessary, and Holt agreed.  (Docs. 10-5 at 609 and 10-6 at 258)

Because the trial judge repeatedly prohibited the jury from communicating

about or researching the case and Holt failed to demonstrate that the jury disregarded

the instructions, the post-conviction court did not unreasonably deny the claim. *Schiro v. Clark*, 963 F.2d 962, 973 (7th Cir. 1992) ("[W]e do not presume prejudice where the defendant's counsel has failed to request that the jury be sequestered. Moreover, in contrast to Schiro's assertion, Judge Rosen repeatedly admonished the jury not to talk about the case with others.").

During trial, trial counsel informed the trial judge that Juror Vinzant communicated about the case with a switchboard operator employed by the public defender's office. (Doc. 10-5 at 333–45)  The switchboard operator testified that Juror Vinzant's wife bowled in her bowling league, and the switchboard operator saw Juror Vinzant at the bowling alley. (Doc. 10-5 at 448–49)  The switchboard operator asked Juror Vinzant why he appeared dejected, and he responded, "this trial is taking too long" and asked, "how many ways can you ask a question?" (Doc. 10-5 at 450)  The switchboard operator responded, "I'm really surprised because one of our top attorneys is on the case," and Juror Vinzant replied, "well, I wouldn't want her defending me." (Doc. 10-5 at 451)  Juror Vinzant knew that the switchboard operator worked at the public defender's office. (Doc. 10-5 at 452)  A couple weeks earlier, Juror Vinzant told the switchboard operator that "he was on a big trial," and the switchboard operator assumed that Juror Vinzant was serving as a juror on Holt's case. (Doc. 10-5 at 455)

The trial judge reserved ruling on Holt's motion to discharge Juror Vinzant. (Doc. 10-5 at 459)  Trial counsel raised concern that Juror Vinzant was discussing

the case with other jurors, and the trial judge responded as follows (Doc. 10-5 at 459–60):

| [Trial counsel:] | Well, my only concern about that, Your Honor, is if Mr. Vinzant is lying to the Court about talking about the case, we don't know what he is doing on an ongoing basis with the jury right now. |
|---|---|
| [Court:] | If you recall, I asked and instructed the jurors themselves in essence to tattle on each other. Do you remember that specific instruction if anything comes to their attention that they believe is a violation that it's their responsibility to bring it to my attention? |
| | So let me just — again, I don't want to — I want to review those cases that I've accumulated just to see if there's anything that gives me any further insight as to the [level of] impropriety[ ]. |

After conducting research, the trial judge summarized reasons to deny Holt's motion to discharge Juror Vinzant and offered the parties additional time to further research the issue and present additional argument. (Doc. 10-5 at 467–73)

The next day, trial counsel presented additional argument and requested that the trial judge interview Juror Vinzant (Doc. 10-5 at 629–30):

| [Trial counsel:] | And, furthermore, it's an additional concern that not only has he not followed his oath as a juror to follow the Court's instructions but when the Court asked the panel yesterday morning and following the recess yesterday whether anyone had discussed the case with them or whether they had discussed the case with anyone, the entire panel said no, including Mr. Vinzant. |
|---|---|

It raises additional questions as to what
other instructions that he's not following.

It's our position that he has violated his
oath as a juror to follow the law and he
should be removed.

If the Court's not willing to do that at this
point, he at least needs to be interviewed.
But it's our position that he's already
shown enough to be removed.

The trial judge granted Holt's motion to discharge Juror Vinzant but declined

to interview him.  (Doc. 10-5 at 640–42)  The trial judge warned the other jurors that

the need to discharge Juror Vinzant arose because he had discussed the case with

someone outside the courtroom (Doc. 10-5 at 646):

[Court:]       Let me just explain, I think you are
               entitled to an explanation. Mr. Vinzant is
               not with us.

               We were in receipt of some information
               that he had some general discussion,
               somebody approached him just generally
               and had some general discussions about
               the case outside of the courtroom.

               So I found it necessary to discharge him
               as a juror in the case. And I guess that just
               goes to further emphasize the need to
               make sure you abide by all the
               instructions that are given to you.

In his post-conviction motion, Holt asserted that "[c]ounsel was ineffective for

failing to request that the court interview Mr. Vinzant and the other jurors because of

the probability that Mr. Vinzant had been discussing his opinions with the other

jurors."  (Doc. 10-7 at 147)  Because trial counsel raised concern that Juror Vinzant

had spoken with the other jurors and asked the trial judge to interview Juror Vinzant,

- 56 -

the record refutes Holt's claim.  Also, because Holt failed to attach to his motion an

affidavit or other evidence demonstrating that Juror Vinzant discussed the case with

the other jurors, only speculation supports the claim. Consequently, the

post-conviction court did not unreasonably deny the claim.  *Caderno v. United States*,

256 F.3d 1213, 1217 (11th Cir. 2001) (citing *Tejada v. Dugger*, 941 F.2d 1551, 1559

(11th Cir. 1991)).

Ground Seven is denied.

**<u>Ground Eight:</u>**

Holt asserts that trial counsel was ineffective for not arguing in an expanded

motion for new trial that the prosecutor failed to prove manslaughter at trial.  (Doc. 1

at 22–24)  The post-conviction court denied this claim as follows (Doc. 10-7 at 118)

(state court record citations omitted):

> [Defendant asserts:] "Defense counsel rendered ineffective
> assistance for not identifying [that] a key element of the alleged
> crime of manslaughter was not proven beyond a reasonable
> doubt during the post-verdict motion for [judgment of acquittal
> and] motion for new trial." The Defendant argues that the State
> did not prove that he caused the death of Robert Wiles, so he
> cannot be convicted of manslaughter. The evidence presented
> by the State was sufficient to support the jury's conclusion that
> the Defendant was responsible for the death of Robert Wiles
> and inconsistent with his claim of innocence. Counsel's
> performance did not fall below an objective standard of
> reasonableness in not arguing that the State did not show
> causation in the post-verdict motion. [The claim] is denied.

The indictment charged Holt with first-degree murder (Doc. 10-2 at 2), and

the jury found Holt guilty of manslaughter, a lesser offense.  (Doc. 10-6 at 300)  After

the prosecutor's case-in-chief concluded, trial counsel moved for a judgment of

acquittal and argued that the prosecutor failed to prove that Holt caused the death of Wiles (Doc. 10-4 at 987–988) (bolding added):

[Trial counsel:]   Your Honor, in this particular case, Mr. Holt is charged, as you're aware, in the indictment with first-degree murder, kidnapping, extortion, and written threats to kill or do bodily harm.

Here before Your Honor even viewing the evidence that the State has presented and viewing that evidence in the light most favorable to the State, the State has failed to prove that the crimes were committed, specifically that it was Stobert Holt [who] was the individual who was the perpetrator of those crimes.

In reference to the jury instructions, I'm sure Your Honor has — is familiar with the elements with regard to the crimes. I'm just specifically referring to element number two in the premeditated first-degree murder statute 782.04 subsection 1-A, number 2, that **the death was caused by the criminal act of Stobert Holt**.

In regard to a felony murder theory under 782.04 subsection 1-A, element number two, the death occurred **as a consequence of and while Stobert Holt was engaged in the kidnapping**.

Trial counsel summarized relevant opinions and argued that the prosecutor failed to prove that Holt caused the death of Wiles.  (Doc. 10-4 at 987–1010)  After the prosecutor responded, the trial court denied the motion as follows (Doc. 10-5 at 6–7):

[Court:]   Basically I'm fully aware that it is my obligation to determine whether or not there's sufficient evidence present in this case to exclude other inferences.

> You know, the cases I've read and some of the language that I am attune to is that it's not a requirement for the State to rebut every possible variation of events that could have occurred and what I believe I must do is look at the evidence to determine whether or not there is evidence presented by the State which is inconsistent with the defendant's theory of the events here.
>
> And I believe that there's sufficient evidence in the record to establish that there's inconsistencies with the defendant's story of the events that have been voiced to the Court.

After the prosecutor's rebuttal case concluded, trial counsel renewed the motion for a judgment of acquittal and argued that the prosecutor failed to rebut the defense's reasonable hypothesis of innocence (Doc. 10-5 at 1001–16):

> [Trial counsel:] It's the defense's position, Your Honor, that the defense has put on a reasonable hypothesis of innocence that someone had better motive, better opportunity, and that it was not Mr. Holt that had anything to do with the kidnapping, with the first-degree murder, with the extortion, or with the written threats to do bodily harm.
>
> The State has failed to rebut this presumption and, therefore, this matter should not go to the jury and we're asking the Court to grant our judgment of acquittal as to Counts One through Four of the Indictment.

In response, the prosecutor informed the trial court of the prosecution's intent to proceed only on the felony murder.  (Doc. 10-5 at 1021–22, 1025)  The trial court denied the renewed motion as follows (Doc. 10-5 at 1027–29):

[Court:]        Having evaluated all the evidence that has been presented and trying to read the various cases dealing with circumstantial evidence, it is my finding and my conclusion that it is up to the State to present evidence which creates some conflict with the defendant's theory.

I think in this case I am finding and coming to the conclusion that the State has presented competent evidence which conflicts with the defendant's theory of the events that occurred and as a result of that it is a jury question as to whether or not the State has met its burden to prove guilt beyond and to the exclusion of all reasonable doubt.

So I think that while there is an alternative hypothesis there is sufficient conflict in the evidence which allows this to go to the jury.

So I'm denying the motion for judgment of acquittal in regard to all four counts with the State's agreement that the premeditated aspect of their initial claim is being withdrawn.

So we will go to the jury on all four counts but under Count One the primary charge will be as a felony murder.

After the jury found Holt guilty of manslaughter, trial counsel moved for new trial, "rel[ied] on all grounds previously cited during the motions for judgment of acquittal made during trial," and further argued that the prosecutor failed to rebut the defense's reasonable hypothesis of innocence. (Doc. 10-6 at 303–07) The trial court denied the motion in a written order. (Doc. 10-6 at 310) Because trial counsel moved for a judgment of acquittal both during trial and after trial and argued that the

prosecutor failed to prove that Holt caused the death of Wiles, the record refutes Holt's ineffective assistance of counsel claim.

Manslaughter requires proof that the defendant caused the death of the victim. (Doc. 10-6 at 226) *Dean v. State*, 230 So. 3d 420, 423 (Fla. 2017). A court will not grant a motion for judgment of acquittal if competent, substantial evidence supports the conviction. *Pagan v. State*, 830 So. 2d 792, 803 (Fla. 2002). "If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction." *Pagan*, 830 So. 2d at 803. "However, if the State's evidence is wholly circumstantial, not only must there be sufficient evidence establishing each element of the offense, but the evidence must also exclude the defendant's reasonable hypothesis of innocence." *Pagan*, 830 So. 2d at 803.

At trial, the prosecutor proved that Wiles disappeared on April 1, 2008. (Doc. 10-3 at 318–19, 338–40) Wiles and Holt frequently clashed with each other at work, Wiles's inexperience affected Holt's quarterly bonuses, and Wiles believed that the company would soon terminate Holt. (Doc. 10-3 at 625–26, 738–40, 746, 781–84, 788–90) Phone records showed that Holt called Home Depot at 8:42 P.M. on April 1, 2008. (Doc. 10-4 at 563–64, 662) Thirteen minutes later, someone purchased with cash duct tape and a plastic tarp from the same Home Depot store that Holt had called. (Doc. 10-4 at 654–56) Someone used Wiles's mobile telephone on April 3, 2008 in the late afternoon to send a text message to Wiles's father demanding that he

read his e-mail "if [he] ever want[ed] to see [his] son again." (Doc. 10-3 at 297)  Cell site data, photographs from cameras installed at toll booths, and records from the toll booth operator showed that Holt traveled with Wiles's mobile telephone from Lakeland to Orlando on the evening of April 3, 2008.  (Doc. 10-4 at 399–401)

Holt told agents that he went to Hooters on the evening of April 1, 2008. (Doc. 10-3 at 961–62)  Surveillance video from Hooters showed that Holt never entered or exited the restaurant that night.  (Doc. 10-4 at 961–62)  Holt claimed that he paid a bill at the Outback with a credit card that night.  (Doc. 10-3 at 963) Records from the Outback showed that Holt never paid for a bill with a credit card that night.  (Doc. 10-4 at 963)  After agents discovered a firearm underneath the hood of Holt's car, Holt replaced the barrel of the firearm, which would change the unique marks left on a bullet traveling through the barrel.  (Docs. 10-3 at 951–52, 677–81 and 10-4 at 536–37)

Drawing reasonable inferences from this evidence, viewed in the light most favorable to the prosecution, a rational juror could find beyond a reasonable doubt that Holt caused Wiles's death.  *Edwards v. State*, 230 So. 3d 12, 14 (Fla. 4th DCA 2017) ("[A] detective testified that after the victim went missing, appellant and victim's cell phones pinged off the same cellphone tower, meaning that they were both within the same general area at or about the time she was murdered."); *Carranza v. State*, 985 So. 2d 1199, 1203 (Fla. 4th DCA 2008) ("[The defendant] made several inconsistent statements to the detectives.  That in and of itself can constitute grounds upon which a trier of fact may reject the defendant's reasonable hypothesis of

innocence."); *Oliver v. State*, 214 So. 3d 606, 613 (Fla. 2017) ("'Evidence that a suspected person in any manner endeavors to evade a threatened prosecution by any *ex post facto* indication of a desire to evade prosecution is admissible against the accused where the relevance of such evidence is based on consciousness of guilt inferred from such actions.'") (citation omitted).

Holt testified and denied that he killed Wiles.  The jury rejected Holt's testimony and found him guilty of manslaughter.  *United States v. Margarita Garcia*, 906 F.3d 1255, 1273 (11th Cir. 2018) ("As the Supreme Court has explained, a defendant who chooses to take the stand runs 'the risk that in so doing he will bolster the Government case enough for it to support a verdict of guilty.'") (quoting *McGautha v. California*, 402 U.S. 183, 215 (1971), *vacated in part on other grounds*, *Crampton v. Ohio*, 408 U.S. 941 (1972)).

Because trial counsel moved for a judgment of acquittal during and after trial and an expanded motion for new trial would not succeed, trial counsel was not ineffective, and the post-conviction court did not unreasonably deny the claim. *Meders*, 911 F.3d at 1354.

Ground Eight is denied.

**Ground Nine:**

Holt asserts that trial counsel was ineffective for not arguing in an expanded motion for new trial that the jury's guilty verdict for manslaughter was legally inconsistent with the jury's not-guilty verdict for kidnapping.  (Doc. 1 at 25–27)

The post-conviction court denied this claim as follows (Doc. 10-7 at 118) (state court record citations omitted):

> [Defendant asserts:] "Trial counsel rendered ineffective assistance for failing to file a motion for arrest of judgment where verdicts are truly inconsistent as to the charges of interlocking felonies. The Defendant alleges that his counsel should have filed a motion for arrest of judgment. He alleges that, "[b]ecause the acquittal of Defendant as to the offense of kidnapping necessarily acquitted Defendant of felony murder, and negated an essential element of manslaughter by act, defense counsel rendered ineffective assistance of counsel for failing to file a motion for arrest of judgment due to the jury returning a 'truly inconsistent' verdict." The Defendant is mistaken. The fact that the Defendant was not found guilty of kidnapping did not provide his counsel with a basis to file a motion for arrest of judgment. Counsel's performance did not fall below an objective standard of reasonableness in not filing a motion for arrest of judgment on the basis of alleged inconsistent verdicts. [The claim] is denied.

Whether the jury's guilty verdict for manslaughter and not-guilty verdict for kidnapping were legally inconsistent is an issue of state law, and a state court's determination of state law receives deference in federal court. *Herring*, 397 F.3d at 1355. "While factually inconsistent verdicts are permissible in Florida because they result from a jury's inherent authority to acquit, a legally inconsistent verdict cannot stand." *Morris v. State*, 349 So. 3d 491, 493 (Fla. 1st DCA 2022). "A legally inconsistent verdict occurs when a finding of not guilty on one count negates a necessary element for conviction on another count." *Morris*, 349 So. 3d 491, 493.

For kidnapping, the prosecutor must prove that the defendant "forcibly, secretly, or by threat confin[ed], abduct[ed], or imprison[ed] another person against her or his will and without lawful authority, with intent to [h]old for ransom or reward [or] . . . [i]nflict bodily harm upon or to terrorize the victim or another

person." *Johnson v. State*, 969 So. 2d 938, 955 (Fla. 2007).  (Doc. 10-2 at 3)  For

manslaughter, the prosecutor must prove "the unjustified or inexcusable killing of the

victim and 'a causative link between the death and the act, procurement, or culpable

negligence of the defendant.'"  *Dean*, 230 So. 3d at 423 (quoting *Tyus v. State*,

845 So. 2d 318, 321 (Fla. 1st DCA 2003)).  Because an acquittal on kidnapping does

not negate an element of manslaughter, an expanded motion for new trial would not

succeed, and the post-conviction court did not unreasonably deny the claim.  *Meders*,

911 F.3d at 1354.

Ground Nine is denied.

## Ground Ten, Sub-claim A

Holt asserts that trial counsel was ineffective for not objecting to the

instruction on manslaughter by act.  (Doc. 1 at 28–30)  The post-conviction court

denied the claim as follows (Doc. 10-7 at 118–19) (state court record citations

omitted):

> . . . Defendant's motion reads: "Trial counsel rendered
> ineffective assistance for failing to object to faulty jury
> instructions on manslaughter by act." The Defendant alleges
> that the jury instruction read to the jury for manslaughter
> should have included the wording "Stobert Holt intentionally
> committed an act or acts that caused the death of Robert
> Wiles." The Defendant alleges that: "When the element of
> intent is in dispute, the faulty manslaughter by act instruction
> deprives the jury of its ability to decide whether the Defendant's
> lack of intent to kill in conjunction with the attendant
> circumstances established the crime of manslaughter by act. In
> the instant case, the erroneous instruction negated the State's
> burden of proving there was an intentional act committed by
> Defendant that led to the death of Robert Wiles." The
> Defendant is mistaken. The jury instruction given to the jury
> addressed intent. The jury instruction included the following
> language: "In order to convict of manslaughter by act, it is not

necessary for the State to prove that the Defendant had an intent to cause death, only an intent to commit an act that was not justified or excusable and which caused death." Trial counsel's performance did not fall below an objective standard of reasonableness in not objecting to the manslaughter instruction given to the jury. [The claim] is denied.

Whether the jury instruction complies with state law is an issue of state law, and a state court's determination of state law receives deference in federal court. *Niziolek v. Ashe*, 694 F.2d 282, 290 (1st Cir. 1982). The trial court instructed the jury on manslaughter by act as follows (Doc. 10-6 at 225–26):

> [Trial court:] To prove the crime of manslaughter, the State must prove the following two elements beyond a reasonable doubt:
>
> One, Robert Wiles is dead. Two, Stobert Holt caused the death of Robert Wiles.
>
> However, the defendant cannot be guilty of manslaughter if the killing was either justifiable or excusable homicide.
>
> . . .
>
> In order to convict of manslaughter by act, it is not necessary for the State to prove that the defendant had an intent to cause death, only an intent to commit an act that was not justified or excusable [and] which caused the death.

*State v. Montgomery*, 39 So. 3d 252, 256–57 (Fla. 2010), held that an earlier standard instruction for manslaughter by act erroneously required the prosecutor to prove that the defendant "intentionally caused the death" of the victim. *Montgomery*, 39 So. 3d 257, explained: "[T]he relevant intent is the intent to commit an act which caused death, and the State is not required to prove that the defendant intended to kill the victim." Because the trial judge presented to the jury a corrected instruction

clarifying that "it is not necessary for the State to prove that the defendant had an intent to cause death, only an intent to commit an act that was not justified or excusable [and] which caused the death," an objection to the instruction would not succeed, and the post-conviction court did not unreasonably deny the claim.  Fla. Std. Jury Instr. (Crim.) 7.7 (2011). *Meders*, 911 F.3d at 1354.  *Rangel v. State*, 132 So. 3d 844, 846–47 (Fla. 2d DCA 2013).

Sub-claim A of Ground Ten is denied.

## Ground Eleven and Ground Thirteen:

Holt asserts that trial counsel was ineffective for not objecting to the prosecutor's failure to respond to the motion for a bill of particulars.  (Doc. 1 at 31–32)  (Ground Eleven)  He further asserts that trial counsel was ineffective for not objecting to the prosecutor's constructive amendment of the indictment during trial. (Doc. 1 at 38–39)  (Ground Thirteen)  The post-conviction court denied these claims as follows (Doc. 10-9 at 65) (state court record citations omitted):

> [Defendant asserts:] "Ineffective assistance of counsel for failing to object to fundamental constructive amendment of the indictment." The Defendant alleges that the indictment was constructively amended by reference to the principal theory and instructions on the principal theory as well as arguments about a gun used to commit a kidnapping. He alleges, "Defense counsel's failure to object to the constructive amendment of the indictment and failure to secure the statement of particulars resulted in Defendant being tried and convicted on crimes not alleged in said indictment and also resulted in defense counsel being unprepared to defend against the State's use of the principal theory in trial." The Court asked the State to file a response to [the claim].
>
> Much of this [claim] is covered in the Court's discussion of [an earlier claim]. In the State's response, the State asserts, "As to the Defendant's claim of constructive amendment of

the indictment, that takes aim both at the principal theory and the arguments relating to Defendant's firearm. Defendant, having been charged with commission of capital murder, was necessarily also charged as a principal and the [ ] jury was properly instructed thereto. *See, e.g., Larzelere*, 979 So. 2d at 215. As to use of a firearm, again, the evidence of the firearm was litigated, ruled admissible, and clearly was relevant to the State's theory of the case."

The Defendant also complains about his counsel's failure to secure a statement of particulars. The State argues, "[a] defendant has a right to a statement of particulars 'only when the [charging document] does not give him adequate notice of the charge he is expected to meet.' *Thalheim v. State*, 20 So. 938, 941 (1896)." The States goes on to argue, "Where an application for a statement of particulars is nothing more than a 'demand for a detailed statement of the evidence by which the State propose[s] to prove its case,' it should be denied. *Peel v. State*, 154 So. 2d 910, 912 (Fla. 2d DCA 1963) (quoting *Craig v. State*, 116 So. 272, 273 (Fla. 1928)). '[T]he rule of law in Florida is that a bill of particulars is never required in a criminal case in Florida except in exceptional cases . . . .' *Peel*, 154 So. 2d at 912. Where a defendant is 'advised of the nature and cause of the accusation against him and ha[s] notice of the dates on which the acts constituting the offense were committed, there [i]s no necessity for a bill of particulars.' *Id.* (quoting *Craig*, 95 Fla. at 378) (emphasis in *Peel*)." The State also asserts in its response that the "Defendant has not shown how counsel was surprised or confused in the State's theory of the case, and has not shown that discovery did not proceed as in normal cases." The Court agrees with the State's argument.

The Court finds that counsel's performance did not fall below an objective standard of reasonableness with regard to the Defendant's allegations [supporting the claim]. [The claim] is denied.

"A constructive amendment of a charging document allows the jury to convict the defendant of an offense different from or in addition to the offenses alleged in the indictment." *Spagnolo v. State*, 116 So. 3d 599, 604 (Fla. 5th DCA 2013). A constructive amendment violates due process. *Spagnolo*, 116 So. 3d at 604.

Because the indictment alleged that Holt committed first-degree murder and because an aider and abettor may be charged, convicted, and punished as a principal, the prosecutor did not constructively amend the indictment during trial by presenting the theory that Holt acted as an aider or abettor. § 777.011, Fla. Stat.; *Roby*, 246 So. 2d at 570. Because an objection would not succeed, trial counsel was not ineffective, and the post-conviction court did not unreasonably deny the claim. *Meders*, 911 F.3d at 1354.

During closing, the prosecutor did not argue that Holt used the firearm that agents found underneath the hood of his car to kidnap or kill Wiles and instead argued that the firearm was a "potential link to Robert Wiles's death" (Doc. 10-6 at 55–57):

> [Prosecutor:] He comes back. He deposits the check into his Wachovia account. And then what happens? He goes to Shoot Straight in Hillsborough County and he pays cash for a barrel.
>
> Now, this gun is the same gun, the identical gun, that the FBI had expressed an interest in just days before. That same gun was at [the Lakeland facility] the night of Robert's disappearance because [Holt] said in an interview later that it had been in his car since January and he moved it in April inside of his — to underneath the hood of his vehicle.
>
> It was there that night. It was in his car at [the Lakeland facility] by his own statement.
>
> Now, he claims — and I want to put a large line in red under claims because there's no evidence to support this at all.

- 69 -

He claims that this was necessary because
he had damaged the weapon six months
earlier in November I think he said and he
had to buy another barrel.

Why would someone with no money, no
financial resources, on the verge of hiring
a lawyer having borrowed money from
his sister for that purpose, having no
reserves at all, living on the edge from
month to month, realizing that at any
moment in time, [ ] because of the way
the FBI was treating him, Tom Wiles can
come down here and [say] pack your
bags, you're out of here. Pack your bags,
you're gone, you're done, get out of my
business.

How does he choose to spend his money?
He pays cash, $200 in cash, for that barrel.

What would cause someone, Stobert Holt
in particular, to spend 20 percent, $200, of
money that they borrowed to replace a
barrel on a gun that had been inoperative
for six months? Why make that a priority
at this point in your life? You're dealing
with the FBI. That's probably the reason.
There's all kinds of distractions that are
going on. You're not going to be doing
any target shooting. Why is it a priority?

It is a priority because it's a link, it's a
potential link to Robert Wiles's death.
And you know from John Romeo, the
FBI — pardon me, the FDLE analyst, the
firearms expert, tells you if you change the
barrel of a gun you change the identity of
that gun. You can no longer match a
bullet to that gun when the barrel is
changed. That's why it was a priority.
That's why he would spend the money he
did.

The indictment alleged that Wiles "while engaged in the commission of

kidnapping, unlawfully did kill a human being, to wit, Robert Wiles."  (Doc. 10-2 at

2)  "[A charging document] is sufficient if it tracks the statute, and the state need not present proof with which it intends to establish its case." *Lee*, 651 So. 2d at 1222. Because the prosecutor did not constructively amend the indictment by arguing that the firearm was a "potential link to Robert Wiles's death," an objection would not succeed, and the post-conviction court did not unreasonably deny the claim. *Meders*, 911 F.3d at 1354.

Lastly, whether the trial court would grant a request for a bill of particulars is an issue of state law, and a state court's determination of state law receives deference in federal court. *Herring*, 397 F.3d at 1355.  "The court, on motion, shall order the prosecuting attorney to furnish a statement of particulars when the indictment or information on which the defendant is to be tried fails to inform the defendant of the particulars of the offense sufficiently to enable the defendant to prepare a defense." Fla. R. Crim. P. 3.140(n).  The indictment alleged that Holt "on or about April 1, 2008, in [the County of Polk and State of Florida] . . . while engaged in the commission of kidnapping, unlawfully did kill a human being, to wit, Robert Wiles." (Doc. 10-2 at 2)  Florida law grants a defendant broad discovery in a criminal case. Fla. R. Crim. P. 3.220(b).  Because the indictment identified the date, the place, and the victim of the crime, a motion for a bill of particulars would not succeed, and the post-conviction court did not unreasonably deny the claim. *Meders*, 911 F.3d at 1354. *Williams v. State*, 344 So. 2d 927, 928 (Fla. 3d DCA 1977) ("We find to be without merit the contention of the appellant that the court committed error by denying defendant's motion for bill of particulars. Thereby defendant had sought

particulars as to the date, time and place of the alleged offense. . . . The place and date were stated in the indictment.").

Ground Eleven and Ground Thirteen are denied.

**Ground Twelve:**

Holt asserts that trial counsel was ineffective for not objecting to the jury instruction on extortion.  (Doc. 1 at 34–36)  The post-conviction court denied the claim as follows (Doc. 10-9 at 64) (state court record citations omitted):

> [Defendant asserts:] "Defense counsel rendered ineffective assistance by failing to object to the non-standard extortion instructions." The Defendant argues that the jury instruction included the concept of legal malice. He alleges that the instructions should have included "actual malice." Actual malice would require the State to show evil intent or motivation by the Defendant. The Court asked the State to respond to [the claim].
>
> The jury instruction given to the jury regarding extortion reads:
>
> <div align="center">
>
> **EXTORTION**
> **F.S. 836.05**
>
> </div>
>
> To prove the crime of extortion, the State must prove the following two elements beyond a reasonable doubt:
>
> 1. STOBERT HOLT by written or printed communication maliciously threatened an injury to Robert Wiles.
>
> 2. STOBERT HOLT communicated the threat to Tom Wiles with the intent to extort money or other pecuniary advantage.
>
> Maliciously means wrongfully, intentionally, and without legal justification.
>
> The State notes in the response, that "Defendant's claim fails at law, as the definition used, legal malice, is to this day required in trial courts within the jurisdiction of the Second District

Court of Appeal. *See Dudley v. State*, 634 So. 2d 1093, 1094 (Fla. 2d DCA 1994) (holding that malice is an essential element of the crime of extortion and '[a] threat is malicious if it is made intentionally and without any lawful justification.')." Trial counsel is not ineffective for recognizing precedent from the Second District Court of Appeal. The Court finds that counsel's performance did not fall below an objective standard of reasonableness with regard to the Defendant's allegations [supporting the claim]. [The claim] is denied.

Whether a jury instruction correctly defines state law is an issue of state law, and a state court's determination of state law receives deference in federal court. *Herring*, 397 F.3d at 1355.  *Dudley v. State*, 634 So. 2d 1093, 1094 (Fla. 2d DCA 1994) held that extortion requires proof of a malicious threat and that "[a] threat is malicious if it is made intentionally and without any lawful justification." *Calamia v. State*, 125 So. 3d 1007, 1010 (Fla. 5th DCA 2013), certified conflict with *Dudley* and held that extortion requires proof of actual malice, or proof of evil intent or motive. The state supreme court has not resolved the conflict between *Dudley* and *Calamia*.

Because Holt's trial occurred in Polk County, the trial court was bound to follow *Dudley* from the Second District Court of Appeal.  *Pardo v. State*, 596 So. 2d 665, 666–67 (Fla. 1992) ("'[I]f the district court of the district in which the trial court is located has decided the issue, the trial court is bound to follow it.'") (citation omitted).  Consequently, an objection to the jury instruction would not succeed, and the post-conviction court did not unreasonably deny the claim.  *Meders*, 911 F.3d at 1354.

Ground Twelve is denied.

**Ground Fourteen:**

Holt asserts that the cumulative effect of trial counsel's errors denied his federal constitutional rights. (Doc. 1 at 41–42)  Because no series of errors exists to accumulate, the cumulative-error claim is meritless.  *Morris v. Sec'y, Dep't Corrs.*, 677 F.3d 1117, 1132 (11th Cir. 2012).  Ground Fourteen is denied.

## B.  Grounds of IAC on Appeal

**Ground Three:**

Holt asserts that appellate counsel was ineffective for not arguing on direct appeal that the trial court violated his federal rights by overruling trial counsel's objection to an instruction on principal liability.  (Doc. 1 at 9–10)  The state appellate court denied the claim in a decision not accompanied by an opinion.  (Doc. 10-6 at 666)  Holt must demonstrate no reasonable basis for the denial of relief.  *Richter*, 562 U.S. at 98.

*Strickland* applies to a claim of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000).  During the charge conference, the trial court overruled the objection to the instruction on principal liability as follows (Doc. 10-5 at 1031–32):

[Court:]          Now, the defense wanted to be heard on the principal theory as I recall.

[Trial counsel:]   Yes, Your Honor. We do object to not only the 3.5(a) principal instruction but also the jury instructions in 3 and 7.6 as they relate to including that principal language in the final element.

It's the defense's position that there has not been evidence presented at trial to reflect an instruction to the jury regarding this. But we understand Your Honor's ruling.

[Court:]    That's fine. The record is made as far as your concern and objection to those.

Under state law, "[w]hoever . . . aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed . . ., is a principal in the first degree and may be charged, convicted, and punished as such, whether he or she is or is not actually or constructively present at the commission of such offense."  Fla. Stat. § 777.011.  A party is entitled to a jury instruction on its theory of the case if any evidence supports the theory.  *Adamson v. R.J. Reynolds Tobacco Co.*, 325 So. 3d 887, 894 (Fla. 4th DCA 2021).

The prosecutor introduced into evidence a ransom letter that stated, "we have Robert," and instructed, "you must follow our instructions without deviation." (Doc. 10-3 at 166–67)  The letter warned, "we are watching everything," and "if you think you can out smart us it will cost your son his life."  (Doc. 10-3 at 167) "Group X" signed the letter.  (Doc. 10-3 at 167)

Because the letter tended to prove that Holt did not act alone and assisted others in kidnapping and killing Wiles, the trial court correctly overruled the objection to the instruction, the issue on appeal would not succeed, and the appellate court did not unreasonably deny the ineffective assistance of appellate counsel claim. *Salter v. State*, 77 So. 3d 760, 763 (Fla. 4th DCA 2011) ("The Second District Court of Appeal defined 'aid and abet' as 'help[ing] the person who actually committed the

crime by doing or saying something that caused, encouraged, incited or assisted the criminal.'") (quoting *Gale v. State*, 726 So. 2d 328, 329 (Fla. 2d DCA 1999)). *Tuomi v. Sec'y, Fla. Dep't Corrs.*, 980 F.3d 787, 795 (11th Cir. 2020) ("Thus, [appellate] [c]ounsel's performance will be deemed prejudicial if we find that the neglected claim would have a reasonable probability of success on appeal.") (citation and internal quotations omitted).

Ground Three is denied.

## VI.  CONCLUSION

Holt's application for the writ of habeas corpus (Doc. 1) is **DENIED**.  The clerk must enter a judgment against Holt and **CLOSE** this case.

### DENIAL OF CERTIFICATE OF APPEALABILITY
### AND LEAVE TO APPEAL *IN FORMA PAUPERIS*

Because Holt fails to demonstrate either a substantial showing of the denial of a constitutional right or that reasonable jurists would debate either the merits of the grounds or the procedural issues, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**.  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).  Holt must obtain permission from the court of appeals to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on February 16, 2023.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

- 76 -